S90A1387. HIRSH v. CITY OF ATLANTA et al.
S90A1494. WILLIAMS v. CITY OF ATLANTA.
(401 SE2d 530)

BENHAM, Justice.

The City of Atlanta, having declared the actions of certain protestors to be a public nuisance, sought and was granted an injunction against Operation Rescue, several named individuals, and Jane and John Doe, described as others acting in concert with any of the named defendants in the complained of conduct. Contending that aspects of the injunction violate their First Amendment right of free speech, appellant Hirsh, a named defendant, and appellant Williams, who asserted he was a "John Doe," appeal from the entry of certain portions of the injunction.[1]

---

[1] Appellants take issue with the following portions of the 13-paragraph injunction:

3. No person shall conduct demonstrations, pickets or protests within 50 feet of any property line of any facility within the City of Atlanta at which abortions are performed.

5. No first person seeking to pass a leaflet or handbill to or display a sign to or engage in oral protest, education, or counseling with a second person, in the public way or sidewalk area within a radius of 50 feet from any property line of any facility at which abortions are performed in the City of Atlanta or within a radius of 50 feet of any parking lot used by patients, employees, medical practitioners and invitees of such facilities, shall approach closer than five feet from such second person, unless such second person gives oral consent to do so. Immediately upon request of such second person, no such first person shall fail to withdraw to at least five feet from such second person, or, in the alternative, to discontinue all efforts at passing such leaflet or handbill or displaying such sign or engaging in such protest, education or counseling. Without limitation, such imperative statements as "stop,"

At the hearing on the injunction, the city presented evidence that appellant Hirsh and another named defendant informed the Atlanta city police in July 1988 of their intention to blockade a different facility providing abortions within the city limits each day of the Democratic National Convention. Neither the police nor the targeted facility was ever given prior notice of the site or the time of the defendants' actions. From July 19 — September 22, 1988, police encountered the defendants and their followers 22 times at five different locations. The defendants' primary method of operation was to assemble a large group of people at a designated location in the early morning hours and transport the massed group to a certain facility within the city. Upon arrival at their destination, the group trespassed on private property to blockade the means of ingress to and egress from the targeted building by locking arms and sitting and lying down. Emergency entrances, as well as entrances to the clinics and the administrative areas, were blockaded, trapping persons within the building as well as denying access to those physicians, staff, and clients who wished to enter. The protestors refused to leave when ordered to do so by authorized agents of the property owner and by police. When denied access to the private property, the group blocked the public right-of-way. When police barricades were in place, protestors crawled under the barricades separating them from the targeted facility. When placed under arrest, the group members refused to accompany police voluntarily and went limp, thereby forcing police officers to carry or drag them to police vehicles. Until the protestors were removed by arresting officers, the targeted facility was, in effect, shut down. The executive director of one health center testified that her facility had been the target of Operation Rescue activity over 100 times during the 20-month period from July 1988 to the date of the hearing, March 22, 1990.

---

"withdraw," "back off," "get away," "leave me alone," shall be sufficient to constitute such a request. This prohibition shall also apply whenever any such second person is moving to such parking lots from such facilities, or to such facilities from such parking lots.

7. Unless otherwise prohibited by this order, demonstrating, picketing, and protesting shall be permitted in the vicinity of any facility at which abortions are performed in the City of Atlanta only as follows: the number of participants shall not exceed 20 per abortion facility; the participants shall remain far enough apart from each other and from any other person so as not to block or impede ingress or egress to such facility, parking lot or driveway used by patients, their families and friends, employees, medical practitioners, or invitees of said facilities, or to violate any of the provisions of this order. Further that no sign may be used to block or impede ingress or egress to such facility parking lot or driveway and no sign shall induce a passer-by to honk or blow their horn.

10. That defendant Operation Rescue and its officers, agents, and representatives, and the individual named defendants and those working in concert with them are directed and ordered to instruct all members of any such organization and all those working with them not to engage in or participate in any of the activities enjoined in this order.

Upon the arrival of an automobile at a targeted facility, protestors surrounded the car, making it difficult for anyone to exit the vehicle. Upon emerging from a car, a patient was swarmed, became the target of verbal epithets, was photographed by the protestors, and was forced to go through the crushing crowd of protestors in order to enter the facility. On at least one occasion, a patient had to be lifted bodily by police over the protestors in order to gain access to the blockaded facility. A clinic executive director testified that the protestors' activities caused patients much anxiety, that those who did gain access were visibly upset and some emotionally distraught. Patients' blood pressure and pulse rates were elevated by the impediments they had had to overcome to gain entry, subjecting the women to additional health risk should an abortion, performed under local anesthesia, be done while the patient was in such a shaken state. Thus, additional time had to elapse in order for a patient to calm down sufficiently to permit medical care to begin. However, the sounds of the protestors could be heard in the clinic's waiting, counseling, procedure, and recovery rooms, disrupting physicians and staff in all aspects of medical care-giving, as well as being a further impediment to a patient's relaxed state.

The director of the city's detention facilities testified that arrests had been made at protests the two days immediately preceding the hearing, bringing the total number of such arrests to approximately 1,320. The sheer number of persons arrested had forced the city to create temporary jail facilities and to cancel inmate visitation and recreation. Because many protestors refused to give correct names during the booking process, the average length of stay of each protestor in the jail increased to 5.21 days, with a cost to the city of $272,076 to house the incarcerated protestors.

The city introduced into evidence literature published under the name of Operation Rescue urging people to come to Atlanta to join in the protests in July 1988, October 1988, December 1988, and December 1989. There was evidence that an Operation Rescue recorded telephone message encouraged callers to picket a targeted facility, the homes of an attending physician and a prosecuting solicitor, and informed them of rallies at which they would be indoctrinated into the methods to be used during protests at the facilities.

1. The Atlanta city charter empowered the city to define a nuisance and provide for its abatement. Ga. L. 1973, p. 2188, § 1-102 (b), Appendix I, p. 2252, § (31). In September 1988, the Atlanta City Council passed a resolution, finding that defendants' actions, designed to and having had the effect of endangering the public security, health, safety, and welfare of the City and its citizens, constituted a public nuisance, and authorized the City Attorney to seek in-

junctive relief against the defendants.[2]

2. Appellants contend that the portions of the injunction which they have singled out (see footnote 1, supra) impermissibly infringe upon their First Amendment right to free speech.[3] Since public streets and sidewalks have historically been considered "public forums,"

> the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." [Cits.] [*United States v. Grace*, 461 U. S. 171, 177 (103 SC 1702, 75 LE2d 736) (1983).]

a) "Content neutral" speech regulations are those that "are justified without reference to the content of the regulated speech." *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council*, 425 U. S. 748, 771 (96 SC 1817, 48 LE2d 346) (1976). Inasmuch as the injunction applies irrespective of the subject matter to be communicated and does not single out a particular content of speech for better or worse treatment (see id.), it is content-neutral. See also *N. Y. State NOW v. Terry*, 886 F2d 1339, 1363 (2d Cir. 1989); *Portland Feminist Women's Health Ctr. v. Advocates for Life*, 859 F2d 681, 686 (9th Cir. 1988).

b) It cannot be questioned that the city government has a significant interest in maintaining public safety by being able to control traffic on urban streets and sidewalks as well as being able to disperse its law enforcement personnel throughout the city instead of having to assign large numbers of officers to surround potential targets of the defendants' activities; a significant interest in the continued orderly operation of its pretrial detention facility; a significant interest in the right of citizens to obtain desired medical services; and a significant interest in the continued operation of lawful, licensed businesses and

---

[2] Seeking an injunction to enjoin an existing or threatened public nuisance, even though the nuisance constitutes conduct punishable under the criminal laws, is authorized. *Evans Theatre Corp. v. Slaton*, 227 Ga. 377 (3) (180 SE2d 712) (1971).

[3] It is important to note, as did Justice Stevens when the U. S. Supreme Court denied appellants' application for stay of the injunction pending appeal, that this injunction imposes time, place, and manner restrictions upon a class of persons who have persistently and repeatedly engaged in unlawful conduct, [in the jurisdiction imposing the injunction. It is not] an injunction that constitutes a naked prior restraint against a proposed march by a group that did not have a similar history of illegal conduct in the jurisdiction where the march was scheduled. [*Hirsh v. City of Atlanta*, 110 SC 2163 (1990).]

medical facilities. The trial court was authorized to conclude that the pre-injunction actions of the defendants endangered all of those significant governmental interests.

c) In order to meet the requirement that the restrictions be narrowly tailored to serve the significant government interests and leave open ample alternative channels of communication, the ban in Paragraph 3 on demonstrations, pickets, or protests within 50 feet of the property line of a facility providing abortions must be read in conjunction with Paragraph 7 of the injunction, which permits certain demonstrating, picketing, and protesting "in the vicinity of" any facility at which abortions are performed if the number of protestors is limited to 20 and they remain far enough apart from each other so as not to block or impede entry to or exit from the facility, its driveway, and parking lot, and no sign is used to effect such an impediment. Thus, the injunction restricts the defendants' prior behavior by providing a "free zone" in which an overwhelming number of protestors cannot impede the safe provision of medical care by harassing, intimidating, and assaulting facility physicians, staff, and clients. See *Portland Feminist Women's Health Ctr. v. Advocates for Life,* supra at 686. Yet, at the same time, "ample alternative channels of communication" are left open by permitting 20 demonstrators "in the vicinity of," i.e., within the 50-foot area. The 20 demonstrators must, of course, abide by the other portions of the injunction regulating noise and behavior.

Paragraph 5 of the injunction is spatially limited to the area within 50 feet of the facility's property line and an area within 50 feet of a parking lot used by facility staff and patients. It is patterned after a Boulder, Colorado ordinance (§ 5-3-10), and reinforces the 50-foot "free zone" established in Paragraph 3 while creating a restriction beyond the 50-foot area if the facility's parking lot is located beyond the 50-foot "free zone." Within the "free zone" and the area surrounding the parking lot, no one on the public streets or sidewalks may distribute a leaflet, display a sign, or engage in oral protest, education, or counseling with another person from within five feet of the second person without the consent of the second person. This affords a clinic patient, physician, or employee the ability to exit a vehicle and approach the site of medical care without being swarmed, jostled, and yelled at from close range by protestors. While the protestors have the right to express their message, the five-foot "bubble zone" is an appropriate and permissible means for the trial court to use in balancing the protestors' freedom of expression with the patients' rights of access to chosen medical care and to privacy. Note, "Too Close for Comfort: Protesting Outside Medical Facilities." 101 Harvard L. Rev. 1856.

3. The final injunctive paragraph with which appellants take ex-

ception requires the named defendants and the Jane and John Does to instruct all members of the Operation Rescue organization and all those working with them not to engage in or participate in any of the enjoined activities. Requiring appellants to tell their colleagues and followers not to engage in the enjoined activities is not forcing appellants to violate their consciences, religious beliefs, or moral or political philosophies and condone abortion. Rather, it requires them to make their colleagues and followers aware of the reasonable time, place, and manner restrictions imposed upon their First Amendment rights. It is also a means by which the court can ensure that "those persons in active concert or participation with" the defendants receive notice of the injunction so that they will be bound by it. OCGA § 9-11-65 (d).

4. Appellants contend that the noted paragraphs of the injunction violate the Georgia constitutional guarantee of free speech[4] and that their issuance by the trial court constituted a legislative act, thereby violating the separation of powers doctrine found in the state constitution.[5]

While the state constitutional guarantee of free speech is absolute as to what it protects, it does not protect all speech, for it does not protect that which is "an abuse of that liberty." *K. Gordon Murray Productions v. Floyd*, 217 Ga. 784, 791 (125 SE2d 207) (1962). Furthermore, legislative or judicial action may infringe upon protected expression if

> "it furthers an important government interest; if the government interest is unrelated to the suppression of speech; and if the incidental restriction of speech is no greater than is essential to the furtherance of that interest." [*Harris v. Entertainment Systems*, 259 Ga. 701, 703 (386 SE2d 140) (1989).]

The restrictions imposed by the injunction relate to the time, manner, and place of appellants' exercise of their First Amendment rights. The only content-related restriction (no signs inducing passing motorists to honk their horns are permitted within the 50-foot "free zone") furthers an important government interest, to avoid loud noises or sound which disturbs, injures, or endangers the health and safety of

---

[4] "No law shall be passed to curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish sentiments on all subjects but shall be responsible for the abuse of that liberty." 1983 Ga. Const., Art. I, Sec. I, Par. V.

[5] "The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided." 1983 Ga. Const., Art I, Sec. II, Par. III.

any patient, employee, or physician so as to complicate the medical service being provided. The Georgia constitutional safeguard of free speech is not violated since the incidental restriction on speech is no greater than is essential to the furtherance of the important governmental interest.

The trial court's issuance of the injunction does not amount to a usurpation of the legislative power by a member of the judicial branch. The trial court was authorized to enjoin a public nuisance, and the public nuisance herein involved had constitutionally-protected elements. The trial court did no more than exercise its power to mold a decree so as to meet the exigencies of the case. OCGA § 23-4-31.

> 5. Liberty can only be exercised in a system of law which safeguards order. . . . [O]ur constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society. [*Cox v. Louisiana*, 379 U. S. 559, 574 (85 SC 476, 13 LE2d 487) (1965).]

The evidence supports the trial court's decision that the actions of the defendants threatened the safeguard of order in the City of Atlanta. The injunction entered by the trial court permits appellants to exercise their right of free speech by engaging in social protest, limited only by reasonable time, place and manner restrictions. By doing so, the injunction also safeguards the order necessary to preserve the continued exercise of liberty, including appellants' rights of free speech and assembly. We hold, therefore, that since the injunction, as construed herein, is not subject to the constitutional challenge urged by appellants, there is no basis for reversal of the trial court's judgment.

*Judgment affirmed. All the Justices concur, except Smith, P. J., and Fletcher, J., who dissent.*

FLETCHER, Justice, dissenting.

As the majority and the parties below point out, the conduct of some of the demonstrators was clearly illegal and not protected by the First Amendment; the conduct of others involved only peaceful picketing, conduct which is protected by the First Amendment. The majority opinion details the inadequacies of the criminal justice system in addressing and preventing illegal and unprotected conduct of some demonstrators.[6] In my opinion, the entanglement of illegal and legal

---

[6] At what point do the courts decide that due to the failure of the criminal justice sys-

conduct in this case has resulted in an injunction that is overbroad.

The trial court has attempted to fashion a civil remedy which will eliminate the criminal conduct of the demonstrators. However, the injunction also curtails non-consensual, peaceful activities traditionally associated with protests, and, as a result, runs afoul of the First Amendment. The injunction restricts peaceful picketing, leafletting, displaying of signs and verbal communication of beliefs to an area at least 50 feet from the property line of any abortion facility.

It is undisputed that, as a general proposition, "peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace*, 461 U. S. 171, 176 (103 SC 1702, 75 LE2d 736) (1983). I cannot agree with the majority's conclusion that the injunction is tailored narrowly enough to protect First Amendment interests. The majority points out that

> [w]ithin the "free zone" and the area surrounding the parking lot, no one on the public streets or sidewalks may distribute a leaflet, display a sign, or engage in oral protest, education, or counseling with another person from within 5 feet of the second person without the consent of the second person.

Majority p. 26. I agree with the majority that this procedure will prevent swarming, jostling and yelling by the protestors. It will also deny the protestors their right to free speech in that the injunction infringes on virtually all non-consensual contact with the public.

I would also note that the portion of the injunction restricting the protestors to zones 50 feet away from any property line of any facility at which abortions are performed, or any parking lots used by patients, employees, medical practitioners and invitees of such facilities, is not a "regulation of . . . place . . . narrowly tailored to serve a significant government interest." *Perry Ed. Assn. v. Perry Local Ed. Assn.*, 460 U. S. 37, 45 (103 SC 948, 74 LE2d 794) (1983). Many streets together with the public sidewalks that abut them lie within rights-of-way that are 50 feet or less in width. With no public property lying within a reasonable distance of the entrances to the facilities on which they are now permitted to protest, does not this injunction deprive peaceful protestors of a public forum in which to exercise their rights of free speech? The overly broad restrictions contained in the injunction have resulted in displacement of the protestors to areas in which no effective exercise of their First Amendment rights can be made.

The geographic restrictions on the demonstrators in this case are

---

tem, they will permit infringement on First Amendment rights?

far greater than in any of the cases cited by the majority. In *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 859 F2d 681 (9th Cir. 1988), the demonstrators engaged in much of the same criminal conduct that is present in this case. However, in a narrowly tailored order, the trial court enjoined "obstructing the free and direct passage of any person" into the abortion facility, and demonstrating or distributing literature "in a rectangular zone that extends from the Center's front door to the curb and twelve and one-half feet on either side of a line from the middle of the Center's door to the curb." Id. at 684. In *N. Y. State NOW v. Terry*, 886 F2d 1339, 1345 (2nd Cir. 1989), the trial court only enjoined demonstrators from certain aspects of sidewalk counseling and from "trespassing on, blocking or obstructing ingress into or egress from any facility at which abortions are performed."

Because I would hold that the injunction in the case before us is overbroad, I respectfully dissent to the majority opinion. I am authorized to state that Presiding Justice Smith joins in this dissent.

DECIDED MARCH 15, 1991.

*Jay Alan Sekulow*, for appellants.

*Marva Jones Brooks, Joe M. Harris, Jr., Bruce P. Johnson, Michael L. Smith, Alan I. Begner, Yolanda F. Williams*, for appellees.