[No. A070725. First Dist., Div. Four. Oct. 28, 1996.]

PLANNED PARENTHOOD ASSOCIATION OF SAN MATEO COUNTY et al., Plaintiffs and Respondents, v.
OPERATION RESCUE OF CALIFORNIA et al., Defendants and Appellants.

**COUNSEL**

Richard G. Katerndahl and Dennis L. Kennelly for Defendants and Appellants.

McCutchen, Doyle, Brown & Enersen, Hope A. Schmeltzer and Beth H. Parker for Plaintiffs and Respondents.

**OPINION**

POCHÉ, J.—Defendants Operation Rescue of California and Robert Lynn Cochran appeal from a permanent injunction establishing place and manner

restrictions on demonstrations conducted at: (1) a clinic operated by plaintiff Planned Parenthood Association of San Mateo County, and (2) the home of plaintiff Dr. O., a physician who treats patients at the clinic. The primary issue presented is whether the restrictions go beyond the guidelines of *Madsen* v. *Women's Health Center, Inc.* (1994) 512 U.S. 753 [129 L.Ed.2d 593, 114 S.Ct. 2516] (*Madsen*) to impinge upon protected speech.

We conclude: (1) that the ban on protesters coming within 15 feet of the clinic serves significant state interests and is compatible with constitutional requirements; (2) the exclusion of protesters within 250 feet of the apartment building in which the doctor resides cannot be sustained because a less restrictive measure holds reasonable the prospect of striking a more precise balance between the competing goals of preserving personal privacy while maximizing the opportunity for public expression; and, (3) that the portion of the injunction which forbids appellants from "[a]pproaching any Planned Parenthood staff member, patient, or companion once that person has made it unmistakably clear that he or she does not wish to be approached" burdens speech more than necessary. We therefore affirm the judgment in part and reverse in part.

## BACKGROUND

Because constitutional freedoms are involved, this court must make an independent examination of the entire record. (See *Feminist Women's Health Center* v. *Blythe* (1995) 32 Cal.App.4th 1641, 1654 [39 Cal.Rptr.2d 189].) The relevant portions of the record consist of testimony, exhibits, and declarations submitted in connection with the preliminary injunction issued in 1993.

Dr. O. described the tactics used against him. On February 15, 1992, he left his apartment and was about to drive away when a group of 20 to 25 people surrounded his car. Several persons placed themselves on the ground in front of and behind the car. Others banged on it. When Dr. O. tried to return to his apartment "they blocked the . . . entrances and started talking to me about . . . abortion . . . . [¶] They had pictures and the usual talks and they made me promise that I will not do abortions, otherwise we will not let you go inside your house. We will not let you go out." Dr. O. made it to his apartment and called police. When an officer arrived, the group had dispersed. The officer escorted Dr. O. to the clinic. That night Dr. O. found on his wife's car a note "which said that you promised not to kill and . . . Jesus will punish you, things like that." All of the tires on his car had been deflated.

About a week later, Dr. O. noticed he was being followed by a brown pickup as he drove to work. After he stopped at a doughnut shop, Dr. O. was approached by a man who had been in the group of the previous week. The man called Dr. O. by name and said "I want to talk to you." Dr. O. left and resumed driving. The man continued to follow in his own vehicle. Dr. O. stopped at a gas station and was talking to police when the man again "stood next to me." The man left when Dr. O. began describing him to police over the telephone.

Four days later the same man in a brown pickup was waiting outside Dr. O.'s apartment complex when he left early in the morning to drive to the "Chico clinic." "[H]e followed me for a couple of streets and then he went away."

Three days later, February 29, 1992, a group outside his apartment waved anti-abortion banners and chanted. They also handed out pamphlets and showed "antiabortion movies" on a video machine to people walking by on the sidewalk. The group numbered approximately 15 and "they were protesting outside for quite a while." Eventually Dr. O. "received a call from the police car who [*sic*] was there outside the apartment." The officer apparently informed Dr. O. that the protesters were willing to leave "if I go down and talk to them." With the officer as escort, Dr. O. met with the group. During the ensuing discussion, one of the group admitted that "we" had deflated the tires on Dr. O.'s car.

On March 7, 1992, a smaller group was again outside the apartment. One person had a camera and was taking pictures. With the aid of a "police escort," Dr. O. drove to work.

Several days later, Dr. O. and his wife were in Chico. His wife passed on a note which stated " 'Stop doing abortions, your hands are bloody,' and things of that effect." Dr. O. was followed by "abortion protesters" as he went into the clinic.

On March 14, 1992, three people outside Dr. O.'s apartment were carrying "a very large sign[] stating that Dr. Dahmer lives here." "Then police came and . . . they went away."

A week later a group of 20 to 25 persons were outside Dr. O.'s apartment "walking back and forth on the . . . sidewalk, and chanting very loudly." Police arrived and "video taped the whole incident."

Therese Wilson is responsible for security at the clinic. Following the February 15th incident, the clinic arranged for "teams" of four staffers to "go

to Dr. O[.]'s house every Saturday and be there with his family just in case protesters did arrive." On March 7th Wilson saw Steve Butler "taking pictures of the house and of us" and "also of our license plates on our cars."[1] Wilson knew from a protest at the Pleasanton clinic that Butler had publicly identified himself as affiliated with Operation Rescue. Butler was also connected with Youth For America. Wilson was present at the March 21st protest outside Dr. O.'s apartment. The protesters carried "the same signs . . . we see at demonstrations that Operation Rescue coordinates." The protest, which lasted for approximately five hours, broke up when police threatened to make arrests for violating a federal court's restraining order. Literature and newsletters from Operation Rescue and Youth For America indicated that protests would be held outside Dr. O.'s home on specified dates; press releases took credit after the protests had been held.

Ms. Wilson further testified that "this was the first time one of our doctors had been singled out" and "harassed in a pattern" "at home as well as . . . work." Abortion opponents are now "targeting . . . on doctors when they used to focus in on patients [entering] our clinics."

Anne Colby testified that there were regular protests from 1988 to 1992 while she was executive director of the clinic.[2] During this period several "very large . . . blockades" of more than 100 protesters resulted in the clinic's temporary closure. Typically, "rows of people block[ed] all the doors" to the clinic. On at least one occasion police arrested protesters inside the clinic. These demonstrations were organized or coordinated by Operation Rescue. Patients found the protests threatening, and some did not come into the clinic for appointments. Noise from the protests could be heard in the patient waiting room, which abuts the sidewalk. The protests caused the clinic to shift its entrance doors and to hire and train staff for an "escort program" to bring patients through the protesters. According to Ms. Colby, injunctive relief "seems to be the only thing that helps."

The trial court found that: "Defendants' conduct has effectively forced . . . patients to walk a gauntlet of intimidation to reach the clinic. It has frightened them, reduced them to tears, and caused them severe emotional upset. Patients' heightened stress levels, in turn, have complicated their medical procedures. Patients have required more counseling and, on occasion, more medication before procedures are performed. Others have canceled or delayed their appointments to avoid the protesters. The evidence

---

[1]Dr. O. identified Butler as the person who admitted the deflating of the tires of his (Dr. O.'s) car. Dr. O. testified that Butler was present at the protests on February 15, February 29, and March 7.

Butler stipulated to entry of a permanent injunction against him.

[2]In a 1992 declaration Ms. Colby stated that police had been summoned "on dozens of occasions" to deal with protests at the clinic.

showed that delaying an abortion procedure increases the likelihood of complications and may force the woman to undergo the more complicated procedure used in second trimester abortions rather than the simpler first trimester procedure."

Dr. Howard Rosenthal is the medical director for Planned Parenthood in San Mateo. He testified that "before the injunction" the protests "upset patients and caused them to be angry, upset, hostile, crying, frightened and made our job a lot more difficult." Protesters would try to prevent driving into the clinic parking lot. Often directly in front of the clinic they were "chanting, singing, praying, talking to people and holding signs with pictures of fetuses on them, birth signs, abortion is murder." The noise generated by the protesters could be heard inside the clinic. Some patients "didn't show up. . . . [I]t was just too much to handle." Those that came into the clinic required "a lot more calming down and . . . made the procedures more difficult." The protests have also "taken their toll on the staff." Some protesters "were seen in the recovery room window," which "really upset several patients." Dr. Rosenthal agreed with Ms. Colby that the injunction, by shifting the protesters across the street from the clinic, had eased matters for patients and staff.

The initial injunction was issued by the federal district court in March of 1992. Its essential features were the same as subsequently imposed in the injunction now being appealed: buffer zones of 250 feet for Dr. O.'s residence and 15 feet for the clinic.[3] The federal injunction was in effect when, on July 17, 1993, the clinic was the scene of another "rescue."[4] By this time the entrance doors to the clinic had been shifted from the sidewalk at the front to the side adjacent to an interior driveway. Approximately 150 protesters blocked the clinic's entrances and its driveway. Patients had to be escorted from the clinic by police. Photographs taken at the time depict: (1) a line of protesters on the sidewalk in front of the clinic, clearly closer than 15 feet from the building; (2) a double row of protesters blocking the relocated entrance on the side of the clinic; the front row of protesters is seated on the ground, the back row is standing with arms interlocked and behind large sections of plywood; (3) a large group of protesters across the street, facing the clinic with banners and placards; and (4) a number of

---

[3]The federal injunction expired shortly after the district court determined that it lacked subject matter jurisdiction but not until Planned Parenthood and Dr. O. had commenced this state court action in September of 1993.

[4]A "rescue" is much larger in scale than the small (and apparently peaceful) group which picketed the clinic on a regular basis. A "rescue" is a planned, systematic attempt to stop the clinic from functioning. The trial court found that there were four "rescues" at the clinic—in July of 1988, July of 1990, February 15, 1992, and July 17, 1993.

protesters are wearing clothes on which "Operation Rescue" is clearly visible. Dian Harrison, Ms. Colby's successor as the clinic's executive director, testified that the demonstration was preceded by a number of telephone calls from a person who identified himself as "Jim from Operation Rescue." The first advised that "we had been targeted for blockade that morning"; following calls reported that protesters were on the way and gave the routes they were taking as they got closer to the clinic.

In September of 1993 Planned Parenthood commenced this action and obtained a temporary restraining order preventing protesters from coming closer than 250 feet from Dr. O.'s residence and 3 feet from the clinic. Two months later, when the preliminary injunction was issued, the buffer zone around the clinic was increased to 15 feet.

A permanent injunction was entered after the trial court conducted an evidentiary hearing. In addition to what has already been recounted, the court received evidence that a number of protesters, including appellant Cochran, repeatedly violated the provisions of the injunction. Cochran admitted the violations but insisted they were inadvertent.

The "Judgment Of Permanent Injunction" dealt separately with Dr. O. and the clinic. Defendants were ordered not to threaten, follow, telephone, photograph, or block his movements. They were further directed to "stay at least 30 feet away from Dr. O. and his family members," and "at least 250 feet away from Dr. O.'s residence." As to the clinic, defendants were enjoined from: (1) obstructing passage of persons or vehicles into the clinic; (2) "Approaching any Planned Parenthood staff member, patient or companion once that person has made it unmistakably clear that he or she does not wish to be approached"; (3) "Shouting, screaming, or otherwise producing loud noises which can be heard within [the] Clinic"; (4) "Physically touching, threatening to physically touch, or shouting at any individual entering or leaving [the] Clinic"; and, (5) "Demonstrating, picketing, distributing literature, or counseling on Planned Parenthood's private property . . . (including the walkway at the front of the clinic building, the walkways and driveways on either side of the clinic building, and the parking area behind the clinic building), or within fifteen (15) feet of such private property."

REVIEW

I

Both Operation Rescue and Cochran attack the "buffer zone" provision which the trial court established for the clinic. Operation Rescue also objects to the "buffer zone" for Dr. O.

## (A)

The applicable governing principles are settled.

■    As a general matter, the protesters enjoy full constitutional protection for the expression and communication of their views concerning the public issue of abortion. (E.g., *Boos* v. *Barry* (1988) 485 U.S. 312, 318 [99 L.Ed.2d 333, 342-343, 108 S.Ct. 1157].) This is particularly true when these protected activities occur on the public streets and sidewalks, traditionally viewed as the quintessential public forum. (E.g., *Frisby* v. *Schultz* (1988) 487 U.S. 474, 480-481 [101 L.Ed.2d 420, 428-430, 108 S.Ct. 2495].) An injunction curtailing protected expression will be upheld only if the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest. (*Madsen, supra*, 512 U.S. at p. 765 [129 L.Ed.2d at pp. 608-609, 114 S.Ct. at p. 2525].)

*Madsen*, and our state Supreme Court's subsequent decision in *Planned Parenthood Shasta-Diablo, Inc.* v. *Williams* (1995) 10 Cal.4th 1009 [43 Cal.Rptr.2d 88, 898 P.2d 402] (*Planned Parenthood*), precisely establish the state interests at issue in this situation. The state has strong concerns in: (1) protecting the freedom of women to seek lawful services in connection with pregnancy, (2) the delivery of those services with appropriate privacy, (3) preserving public safety and order by ensuring the free flow of vehicular and pedestrian traffic, and (4) preserving property rights. (*Madsen, supra*, 512 U.S. 753, 767-768 [129 L.Ed.2d 593, 609-610, 114 S.Ct. 2516, 2526]; *Planned Parenthood, supra*, at pp. 1017, 1020-1023.) "[T]he combination of these governmental interests is quite sufficient to justify an appropriately tailored injunction to protect them." (*Madsen, supra*, at p. 768 [129 L.Ed.2d at p. 610, 114 S.Ct. at p. 2526].) And if a home is involved the state interest in preserving residential privacy is exceptionally potent. (*Id.* at pp. 775-776 [129 L.Ed.2d at pp. 613-615, 114 S.Ct. at pp. 2529-2530].)

We now analyze whether the injunction protecting those interests burdens "no more speech than necessary." (*Madsen, supra*, 512 U.S. at p. 765 [129 L.Ed.2d at p. 608, 114 S.Ct. at p. 2525].)

## (B)

The *Madsen* court upheld a 36-foot buffer zone around a clinic. The *Planned Parenthood* court affirmed an injunction which limited protest

activities to the sidewalk across the street from a clinic. The 15-foot exclusion zone imposed here falls somewhere between *Madsen* and *Planned Parenthood*.[5]

■ The portion of the injunction ordering protesters to stay off the clinic's property is unexceptional—there is no federal constitutional right to trespass. (E.g., *Adderley* v. *Florida* (1966) 385 U.S. 39, 47-48 [17 L.Ed.2d 149, 155-156, 87 S.Ct. 242]; *Cox* v. *Louisiana* (1965) 379 U.S. 536, 554-555 [13 L.Ed.2d 471, 483-484, 85 S.Ct. 453].)[6] The injunction also ordered protesters not to demonstrate, picket, distribute literature or counsel within 15 feet of the clinic's "private property." In practical effect this required the protesters to stay off the sidewalk at the front of the clinic, and to move either to the sides or across the street. According to the record, the protesters thereafter moved across the street.

The buffer zone encompasses the entrances to the clinic and the interior parking lot, thus ensuring unfettered ingress to and egress from the clinic. It also ensures the unimpeded flow of pedestrian traffic on the sidewalk, and vehicular traffic on the street in front of the clinic. The deference normally extended to a trial court's findings on these sort of fact-specific issues is enhanced by the fact that the trial court here made a personal view of the scene. (Cf. *Sierra Club* v. *Board of Supervisors* (1981) 126 Cal.App.3d 698, 708 [179 Cal.Rptr. 261].) The trial court would therefore be better situated than this court to appreciate not only how closely the clinic waiting room abutted the sidewalk but also whether and to what extent an exclusion zone was required to keep chanting protesters at a distance from patients frightened by those same protesters.[7]

The configuration of the clinic and the surrounding geography limited the trial court's options. The clinic is surrounded on three sides by other buildings; only the side facing the sidewalk and street could be used by the protesters. As the trial court describes it, the clinic is sited so that its "premises are very narrowly set back (less than six feet) from the street,

---

[5]The United States Supreme Court recently agreed to review a circuit court decision upholding a 15-foot "bubble zone" around a clinic. (*Pro-Choice Network of Western New York* v. *Schenck* (2d Cir. 1995) 67 F.3d 377, cert. granted Mar. 18, 1996, __ U.S. __ [134 L.Ed.2d 209, 116 S.Ct. 1260] (Docket No. 95-1065).)

[6]Appellants here invoke only the United States Constitution.

[7]We reject appellant Cochran's claim that the trial court, with what it learned from its view of the scene, unilaterally injected the issue of traffic disruption into the case. *Madsen* and *Planned Parenthood* had already identified the traffic issue as a relevant consideration to the decision the trial court was called upon to make. (*Madsen, supra,* 512 U.S. 753, 768-771 [129 L.Ed.2d 593, 609-611, 114 S.Ct. 2516, 2526-2527]; *Planned Parenthood, supra,* 10 Cal.4th at pp. 1017, 1020, 1022-1023.)

which has a slight double curve in it at that point." The present waiting room for the clinic fronts on the sidewalk. Two driveways cross the sidewalk giving access to a rear parking lot. Given the physical layout of the building and the site the trial court specifically found that "any congregation of pedestrians in front of the San Mateo Clinic creates an extreme traffic hazard." The court also noted that there was evidence of actual obstruction of the sidewalk and the driveway, as well as activities which were potentially distracting to passing drivers.

Moreover, as the trial court found, neither the 15-foot exclusion zone nor a less restrictive area imposed by a prior federal court injunction had been consistently effective in permitting unfettered access. Based upon an analogous situation in *Madsen* of a less restrictive but ineffective prior injunction, the Supreme Court concluded that it was permissible to include the entire sidewalk frontage along the clinic property within a buffer zone, especially where protesters standing across a narrow street could still be seen and heard by individuals coming to the clinic. (Accord, *Planned Parenthood, supra,* 10 Cal.4th at p. 1024 ["A less restrictive alternative had been tried and found wanting."]) Here, too, the trial court found that protesters standing across the narrow street on the sidewalk "can easily be seen and heard." In this case where access had been impeded even with a 15-foot buffer zone in place we cannot say that the inclusion of all the sidewalk fronting the clinic property within the 15-foot exclusion zone burdened more speech than was necessary to prevent intimidation and permit access.

### (C)

Dr. O. lives in an apartment complex whose dimensions are approximately 60 yards by 45 yards. Dr. O. likened the complex's configuration to a horseshoe, with the open end abutting the sidewalk along a public street. His apartment is on the second floor, at the front of the complex. He looks down on the sidewalk. The photographs produced at trial show the apartment building as being set back about 10 yards from the sidewalk in a neighborhood which appears to be exclusively residential.

The injunction ordered protesters to "stay at least 250 feet away from Dr. O[.]'s residence." This directive has an inherent element of imprecision because the site of Dr. O.'s apartment is not established within the complex. It cannot be determined whether the 250 feet commences from the particular part of the complex in which Dr. O. and his wife live, or from the entire complex, or, like the clinic, from the property line. Regardless of how the buffer zone is measured, the practical effect is that the sidewalk in front of

the apartment complex is completely closed to protesters. As they have at the clinic, the protesters moved across the street from the complex. However, the photographs of the scene show the protesters within 250 feet of Dr. O.'s residence, regardless of the point from which that distance is measured. In fact, a point 250 feet from the front of Dr. O.'s building would put the protesters in the center of the building on the opposite block. Thus literal enforcement of the injunction would require the protesters to move 250 feet down the street from either side of the complex in which Dr. O. resides.

*Madsen* struck down a 300-foot zone around a private residence on the ground that "a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result." (*Madsen, supra*, 512 U.S. 753, 775 [129 L.Ed.2d 593, 614, 114 S.Ct. 2516, 2529-2530].) The trial court attempted to distinguish *Madsen* and *Murray* v. *Lawson* (1994) 138 N.J. 206 [649 A.2d 1253] (300-foot residential buffer zone reduced to 100 feet) on the ground that the setting here was not a single-family residence, but a complex in which numerous persons not the protesters' target also lived. *Madsen* requires a more laser-like approach.

The 250-foot zone denies the protesters any opportunity to demonstrate in front of Dr. O.'s building. Instead, they are funneled down the sidewalk to a position which not only effectively eliminates the possibility of the delivery of their message to its intended target but shifts the entire burden of adverse consequences to Dr. O.'s neighbors. Unlike the situation at the clinic, a less restrictive approach has never been tried. It must be.

We will not undertake that task in the first instance. It is far more appropriate that the initial effort be entrusted to the discretion of the trial court, which has a far sounder basis for determining what is appropriate to the circumstances. In making that determination the trial court may consider a number of options. It could, for example, as *Madsen* suggested, decide that no more 10 protesters, keeping a certain distance between themselves, be allowed to picket between specified hours on specified days. (See *Murray* v. *Lawson, supra*, 649 A.2d 1253, 1268; *Hirsh* v. *City of Atlanta* (1991) 261 Ga. 22, fn. 1 [401 S.E.2d 530, 531].) The court could allow picketing on the sidewalk in front of Dr. O.'s building and reserve the option of moving the picketers across the street if difficulties arise. Or, as was done in *Planned Parenthood*, the picketers could be confined to a specified area. (See *Bering* v. *Share* (1986) 106 Wn.2d 212 [721 P.2d 918, 923].) The court could

require advance notice. (*Murray* v. *Lawson, supra*) Other alternatives or factors may be suggested by the parties for the trial court's consideration.[8]

## II

*Madsen* struck down as unduly burdensome an injunctive prohibition against "physically approaching any person seeking services of the clinic 'unless such person indicates a desire to communicate' in an area within 300 feet of the clinic." (*Madsen, supra*, 512 U.S. 753, 773 [129 L.Ed.2d 593, 613, 114 S.Ct. 2516, 2529].) ■ Citing the principle quoted in *Madsen*— "As a general matter . . . in public debate . . . citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment"—Cochran argues that the injunction could not constitutionally require him to discontinue communicating with a person "once that person has made it unmistakably clear that he or she does not wish to be approached." The language at issue here enjoins appellants from "Approaching any Planned Parenthood staff member, patient or companion once that person has made it unmistakably clear that he or she does not wish to be approached."

In striking down the no-approach provision in *Madsen* the Supreme Court objected first to its "prohibition on *all* uninvited approaches of persons seeking the services of the clinic, regardless of how peaceful the contact may be" as "burdening more speech than necessary to prevent intimidation and to ensure access to the clinic." (*Madsen, supra*, 512 U.S. at p. 774 [129 L.Ed.2d at p. 613, 114 S.Ct. at p. 2529].) Finding that there was no evidence that the speech was either "independently proscribable (*i.e.,* 'fighting words' or threats), or [was] so infused with violence as to be indistinguishable from a threat of physical harm" the court concluded that the provision was constitutionally infirm. The court also based its ruling on a second and independent holding that a listener's willingness to hear may not define when a speaker may talk. Thus, the court found that "[t]he 'consent' requirement alone invalidates this provision" because it also burdens more speech than necessary to achieve the twin goals of no intimidation and clinic access. (*Ibid.*)

---

[8]Our decision to reverse, announced here, is advance notice of the impending demise of a part of the injunction protecting Dr. O., his wife, and their neighbors. Pending delivery of our remittitur, respondents may deem it prudent to approach the trial court for modification of the defective provision of the permanent injunction, thus ensuring that Dr. O. and his wife are not inadvertently left unprotected. The trial court will have jurisdiction to modify an injunction even while an appeal is pending. (E.g., *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 787-789 [59 Cal.Rptr. 141, 427 P.2d 805].)

The no-approach provision in this injunction suffers from the same infirmities as that in *Madsen*. Like *Madsen*, the speaker's opportunity for conversation or leafleting is defined by the consent of the potential listener or reader. It is a distinction without a difference that under this provision the listener may be subjected to some speech before making it "unmistakably clear that he or she does not wish to be approached." Once the listener manifests lack of consent the speaker may no longer approach and as a practical matter may not proffer leaflets or conversation. Here, like *Madsen*, there was no finding by the trial court that the speech was independently proscribable or violent. Because the provision limits speech to that consented to by the listener it burdens speech which is peaceable but unwelcome to the listener.

Moreover the no-approach provision here applies far more broadly than that in *Madsen* because it is not limited to approaches made in proximity to the clinic, and thus by its terms limits speech directed to certain persons regardless of where they may be. While the trial court made the factual finding that "individuals *approaching the San Mateo Clinic* have been hounded, intimidated, and harassed" (italics added), the injunction speaks to any approach without specifying that it be made in the vicinity of the clinic. In this respect as well we find the provision burdens more speech than is necessary to ensure physical access to the clinic.

### III

Appellants' remaining contentions may be resolved quickly.

Cochran appears to argue that the injunction is an impermissible attempt to restrict speech based on its content. The Supreme Courts of the United States and California have expressly held to the contrary. (*Madsen, supra,* 512 U.S. 753, 761-764 [129 L.Ed.2d 593, 605-607, 114 S.Ct. 2516, 2523-2524]; *Planned Parenthood, supra,* 10 Cal.4th at pp. 1019-1020.)

■ The injunction applies to "Defendants . . . and all persons acting in concert or participation with them, or either of them, and *all persons with actual notice of this Judgment* . . . ." (Italics added.) Cochran contends in effect that the italicized language makes the injunction unconstitutionally overbroad. Cochran is a party and is specifically named in the injunction. He "therefore lack[s] standing to challenge a portion of the [injunction] applying to persons who are not parties." (*Madsen, supra,* 512 U.S. 753, 775 [129 L.Ed.2d 593, 614-615, 114 S.Ct. 2516, 2530].)

■ Cochran argues in effect that he cannot be enjoined on the basis of what Operation Rescue did at the clinic, while Operation Rescue insists it

should not be held responsible for how Cochran acted vis-à-vis Dr. O. Cochran testified that he has contributed money to Operation Rescue, receives mailings from Operation Rescue, and has attended rallies and rescues (including those at this clinic) organized by Operation Rescue. When asked on cross-examination "You've been involved with that organization for . . . ?" Cochran answered "For a few weeks." This is enough to justify treating Cochran as either a member of Operation Rescue, or as sufficiently associated with it that he is bound by the injunction against that entity. (*In re Berry* (1968) 68 Cal.2d 137, 155-156 [65 Cal.Rptr. 273, 436 P.2d 273]; 6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, §§ 317-318, pp. 269-270.)

Finally, appellants attack a number of the trial court's findings on the ground that they are not supported by substantial evidence. We do not investigate this claim because: (1) they did not set forth all of the relevant evidence in their briefs (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887-888 [160 Cal.Rptr. 516, 603 P.2d 881]), and (2) none of the findings are essential to the judgment (*Leonard* v. *Fallas* (1959) 51 Cal.2d 649, 653 [335 P.2d 665]).

Those portions of the judgment enjoining appellants from: (a) coming within 250 feet of Dr. O.'s residence, and (b) "[a]pproaching any Planned Parenthood staff member, patient or companion once that person has made it unmistakably clear that he or she does not wish to be approached" are reversed, and the cause is remanded for further proceedings not inconsistent with this opinion. The judgment is affirmed in all other respects. The parties shall bear their respective costs.

Anderson, P. J., and Reardon, J., concurred.

Petitions for a rehearing were denied November 20, 1996, and the opinion was modified to read as printed above. The petitions of both respondents and appellants for review by the Supreme Court were denied February 19, 1997. Kennard, J., was of the opinion that the petitions should be granted.