[S.F. No. 24578. June 7, 1984.]

ENVIRONMENTAL PLANNING AND INFORMATION COUNCIL OF WESTERN EL DORADO COUNTY, INC., et al., Petitioners, v. THE SUPERIOR COURT OF EL DORADO COUNTY, Respondent; DETMOLD PUBLISHING CORPORATION, Real Party in Interest.

COUNSEL

Michael H. Remy, Tina A. Thomas, Remy & Thomas, John M. Poswall and Friedman, Collard, Poswall & Thompson for Petitioners.

No appearance for Respondent.

C. Michael Finen, Jonathan P. Burris and Priest, Katz & Finen for Real Party in Interest.

## OPINION

**GRODIN, J.**—This writ proceeding stems from an action by Detmold Publishing Company (Detmold), publisher of a newspaper, the Foothill Times, against Environmental Planning and Information Council of Western El Dorado County, Inc. (EPIC), a nonprofit corporation, and several of its officers. ▊ The gist of the complaint, insofar as it concerns this proceeding, is that EPIC published a newsletter criticizing the newspaper's editorial policies on environmental matters, and calling upon readers of the newsletter not to patronize businesses that advertise in the Foothill Times. The complaint seeks injunctive relief, and both punitive and compensatory damages. Defendants moved for summary judgment with supporting affidavits and, when their motion was denied, filed this petition in mandate to compel reversal of the trial court's order of denial.

Normally courts do not intervene at the pleading stage of a pending action (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379]). We consider that such intervention is warranted here, however, because of the infringement upon defendants' constitutional rights of free speech which would be implicated if the action were permitted to proceed. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572], cert. den. *sub nom. Good Government Group of Seal Beach, Inc.* v. *Hogard* (1979) 441 U.S. 961 [60 L.Ed.2d 1066, 99 S.Ct. 2406]; *Bill* v. *Superior Court* (1982) 137 Cal.App.3d 1002, 1014-1015 [187 Cal.Rptr. 625].) Having issued an alternative writ, we now determine that there exists no triable issue of material fact, and that defendants are entitled to summary judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Whitney's at the Beach* v. *Superior Court* (1970) 3 Cal.App.3d 258, 271 [83 Cal.Rptr. 237]). Accordingly, we shall order issuance of a peremptory writ as petitioners have requested.

### FACTS AND PROCEDURAL HISTORY

EPIC is a nonprofit corporation with a membership of approximately 100 persons in El Dorado County. Its purpose is to promote citizen participation in public affairs and, according to its articles of incorporation, "conserva-

tion and preservation of, and general public appreciation for, the unique historical and natural resources'' of western El Dorado County.[1]

EPIC's April 1982 newsletters criticized the editorial policies of the Foothill Times. In the context of a discussion of the alleged prodevelopment bias of the El Dorado Irrigation District (EID) directors, the newsletter stated in part: ''[T]he western county areas are flooded by the *Foothill Times,* a newspaper that doesn't deserve to be called one. This is the rag that played a major role in last November's election of George Gribkoff and John Smith. Since then it has continued to *ignore established facts, print inaccuracies, and blatantly editorialize* in its 'news' articles.'' The newsletter complained that the four directors of the EID, backed by the newspaper, had taken over the irrigation district on behalf of a ''very limited development group.''

The newsletter went on to ask, ''What can be done about this outrageous situation?'' It then suggested three courses of action. First, ''The most important step is for *you to be informed.* An adequately informed citizenry is the only hope for curing bad government. . . . If you read newspaper articles thoughtfully, talk to people, and attend some EID meetings, you'll develop a fair grasp of what's going on.''

Second, the newsletter suggested; ''Whenever something puzzles you or infuriates you, *write a letter to the editor.* Small letters are big tools. Encourage other concerned people to do the same.''

The third possible course of action was phrased as a question: ''What about *contacting businesses advertising in the Foothill Times* and requesting that they discontinue that advertising? Freedom of speech is one thing; vicious, irresponsible journalism is another, and perhaps you would prefer not to patronize businesses that advertise in such a publication.'' The newsletter went on to propose a recall of the four EID directors.

Nothing more was said in the newsletter about the Foothill Times, except that attached to the two-page newsletter was a list of eighty nonclassified advertisers in two issues of the weekly newspaper. At the top of the list, the newsletter cautioned, ''This is not a black list! No condemnation of these businesses is implied! This list is merely for your convenience should you wish to contact *Foothill Times* advertisers.''

---

[1]This information, which real party in interest does not dispute, is contained in affidavits submitted in support of the motion for summary judgment.

About two weeks after this newsletter was sent to EPIC's members, real party responded by filing the instant lawsuit against EPIC and three of its leaders. Two causes of action, intentional interference with economic relationship and libel, were alleged. Real party sought general and punitive damages and prayed for a "preliminary and permanent injunction restraining and enjoining defendants . . . from publishing or otherwise making false and disparaging statements regarding plaintiff's newspaper and from interfering or inducing others to interfere with plaintiff's business relationship with its advertisers or other customers."

A series of procedural maneuvers ensued. An order to show cause regarding the injunction was issued and both parties briefed the issue; meanwhile EPIC filed a demurrer. The demurrer alleged primarily that the newsletter uttered only opinion and as such was protected by the First Amendment. Respondent superior court overruled the demurrer as to the first cause of action (intentional interference with economic relationship) and sustained the demurrer to the libel cause of action in a September 15, 1982, minute order. EPIC then answered the complaint.

With real party's request for preliminary injunction still pending, EPIC moved for summary judgment on the remaining cause of action, asserting that summary judgment "must be granted to protect Defendants' First Amendment Constitutional rights, that Defendants never actually organized to create a boycott, that even if they had, the action is privileged . . . ." In support of that motion, EPIC filed extensive points and authorities and three affidavits from EPIC leaders. All three averred that they had never contacted any of the Foothill Times' advertisers and that they were unaware of anyone who had. Chairman Langley, in fact, claimed to be unaware of anyone writing a letter to the editor of the Foothill Times, the second alternative mentioned in the newsletter. All three declared that a boycott of real party's advertisers had never been discussed at any of EPIC's meetings. EPIC's former chairperson declared that the only reason communication with advertisers was even mentioned as a possibility "is because we felt that since *Foothill Times* was delivered at no cost, the only way to potentially exert pressure on *Foothill Times* would be, perhaps, through its advertisers." Real party opposed the motion but filed no counteraffidavits.

On December 17, 1982, respondent court granted a preliminary injunction barring EPIC from "interfering or inducing others to interfere" with real party's contractual relationships with its advertisers or customers. EPIC sought "reconsideration and clarification" of the injunction and respondent court on February 8, 1983, dissolved the injunction. On March 30, 1983, however, EPIC's motion for summary judgment was denied. Defendants

then sought a writ of mandate and/or prohibition commanding respondent court to set aside the order denying the motion for summary judgment. After the Court of Appeal denied the petition we granted hearing and issued an alternative writ to consider the questions thus posed.

## DISCUSSION

Defendants' entitlement to summary judgment turns upon whether there exists "no triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).) Plaintiff asserts, and for purposes of analysis we accept, that there exists a triable issue as to whether the newsletter was intended, or was likely to be viewed by readers, as merely "suggesting" a boycott of plaintiff's advertisers, or whether it was intended and likely to be viewed as affirmatively advocating and encouraging such conduct. We assume also that there may exist a triable issue of fact—despite the denials by individual defendants of any further action on their part—as to whether the newsletter actually resulted in any readers withholding patronage from any of plaintiff's advertisers. The question is whether either of these factual issues, or any other factual issue that might properly be asserted to exist,[2] is "material," and for the answer to that question we turn to the applicable principles of substantive law.

We begin with the common law. The courts of this state have recognized that an unjustified, or unprivileged, intentional interference with the prospective economic advantage of another may subject the actor to liability in tort, even when that interference does not take the form of inducing a breach of contract. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 822-823 [122 Cal.Rptr. 745, 537 P.2d 865]; see 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 392-397, pp. 2643-2652, *id.,* (1982 supp.) pp. 172-181.) The tort of interference with contract, we have observed, "is merely a species of the broader tort of interference with prospective economic advantage." (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 823.)

The contours of justification, or privilege, are not precisely defined. In relation to the tort of interference with contract, we have said: "Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor's conduct

---

[2]Detmold's opposition to the motion for summary judgment in the trial court identifies as several "triable issues of fact" what are, in reality, issues of law (e.g., "[w]hether Defendant's speech which advocates boycotting Plaintiff rises to the level of speech espousing the end to racial injustice").

and the relationship between the parties." (*Herron* v. *State Farm Mutual Ins. Co.* (1961) 56 Cal.2d 202, 206 [14 Cal.Rptr. 294, 363 P.2d 310].)[3] When the defendant's action does not interfere with the performance of existing contracts, the range of acceptable justification is broader; for example, a competitor's stake in advancing his own economic interest will not justify the intentional inducement of a contract breach (*Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33, 36 [112 P.2d 631]), whereas such interests will suffice where contractual relations are merely contemplated or potential. (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d 815, 828.)

Most of the cases in which claims of tortious interference have been considered have involved either pure commercial relationships or union-management relationships.[4] There is a paucity of authority in the application of common law principles to a situation such as this, in which a group organized for political purposes allegedly undertakes a consumer boycott to achieve its ends. What authority does exist in this arena strongly suggests, even apart from constitutional doctrine, that such action will not give rise to liability. Certainly the defendants' objective—to change the editorial policies of the Foothill Times in relation to public issues affecting the environment[5]—is a lawful one, and the means used—a peaceful secondary boycott—have likewise been held to be lawful under the common law of this state. (*Fortenbury* v. *Superior Court* (1940) 16 Cal.2d 405, 409 [106 P.2d 411].)[6] And, in somewhat analogous context, the Supreme Court of

---

[3]The factors enumerated by this court in *Herron* were patterned closely after those listed in the original Restatement of Torts (1939) section 767. The Restatement Second of the Law of Torts (1977) abandons use of the term "privilege" or "justification" in favor of the term "improperly interferes," so as to avoid questions of burden of pleading or proof (*id.,* at p. 5), but the factors to be used in determining whether interference is "improper" (§ 767) are essentially the same.

[4](See cases compiled in Witkin, *op. cit. supra,* pp. 2643-2647.) Labor disputes, insofar as they are subject to state common law, have come to be governed by special rules which recognize the right of workers to pursue their economic self-interest by lawful means. (E.g., *McKay* v. *Retail Auto. S. L. Union* (1940) 16 Cal.2d 311, 318-319 [106 P.2d 373], cert. den. (1941) 313 U.S. 566 [85 L.Ed. 1525, 61 S.Ct. 939].)

[5]While Detmold's complaint alleged that defendants acted "with the intent of injuring plaintiff's business and goodwill and in so doing acted maliciously and oppressively towards plaintiff," Detmold does not dispute that the defendants' objective was anything other than that reflected in the newsletter and in the declarations submitted by defendants in support of the motion for summary judgment. In this context, "malice" means simply "without justification." (Rest.2d Torts, p. 5.)

[6]Detmold relies upon a Court of Appeal decision, *Holt* v. *Superior Court* (1950) 100 Cal.App.2d 403 [223 P.2d 881], in support of a contrary view. The court in that case, without reference to *Fortenbury,* spoke of the courts having a "right to restrain the disputants in a particular industry from coercing or conscripting neutrals having no relation to either the dispute or the industry in which it arose, from becoming advocates or participants therein." (*Id.,* at p. 406.) The *Holt* court cited in support of that proposition decisions of the United States Supreme Court holding that the First Amendment does not prohibit states

Pennsylvania has held that no cause of action exists against church leaders who threatened to lead a boycott of church members against a department store in order to influence the broadcasting policies of a radio station which was under the same ownership (*Watch Tower Bible & Tract Soc.* v. *Dougherty* (1940) 337 Pa. 286 [11 A.2d 147, 148]; see also, *Kuryer Pub. Co.* v. *Messmer* (1916) 162 Wis. 565 [156 N.W. 948] [Catholic boycott of newspaper gave rise to no cause of action]).[7]

This case cannot realistically be viewed from an exclusively common law perspective, however, since the very nature of the activities complained of invites constitutional analysis as well. In a case of this sort, constitutional principles impose outer limits upon the category of conduct that may be subject to liability on the basis of common law doctrine, and thus serve to shape the doctrine itself. Moreover, it is precisely the constitutional aspect of this case that warrants appellate intervention through extraordinary writ.

The United States Supreme Court recently had occasion to consider First Amendment limitations upon the power of a state to regulate secondary consumer boycotts directed at political objectives. *NAACP* v. *Claiborne Hardware Co., supra,* 458 U.S. 886, involved a boycott by black citizens in Port Gibson, Mississippi, against white merchants in that city, aimed at putting pressure on white elected officials to accede to the citizens' demands for racial equality and integration. The Mississippi Supreme Court upheld, on common law tort grounds, a judgment for injunctive relief and damages against certain civil rights organizations, their leaders, and their members responsible for the boycott. The basis for the state court holding was that the boycott was accompanied by some acts and threats of violence. In reversing that holding, the high court declared: "The right of the States to

---

from regulating certain forms of picketing. Obviously, those cases have nothing to say about the common law regulation of secondary boycotts in California. To the extent that *Holt* contains language contrary to this opinion, it is disapproved.

[7]Our research discloses one case which provides apparent support to plaintiff, holding that a trial court erred in granting summary judgment for defendant humane society in a suit brought by plaintiff business owners who alleged that the society had intentionally interfered with their economic advantage by urging a tourist boycott of a county in which their businesses were located, in order to pressure local officials into improving conditions at a local dog pound. (*Searle* v. *Johnson* (Utah 1982) 646 P.2d 682.) A careful reading of the opinion reveals, however, that the court did not pass upon the merits of plaintiff's theory. The trial court had granted summary judgment on First Amendment grounds, and the Utah Supreme Court reversed, holding that the First Amendment provided no protection for defendant's conduct, and that plaintiffs were "entitled to present their novel tort theory to the trial court." (*Id.,* at p. 689.) The court's First Amendment ruling appears erroneous in light of the United States Supreme Court's subsequent decision in *NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886 [73 L.Ed.2d 1215, 102 S.Ct. 3409], discussed *infra,* at this page and through page 198.

regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself." (*Id.*, at p. 914 [73 L.Ed.2d at p. 1237], fn. omitted.) Accordingly, the court held that the nonviolent elements of the petitioners' activities were entitled to First Amendment protection. (*Id.*, at p. 915 [73 L.Ed.2d at p. 1237].)

*Claiborne Hardware* draws a crucial distinction between solely economic boycott activity which can be and has been regulated, i.e., by antitrust laws, and political boycotts. The same distinction is present in this case. Justice Stevens pointed out for a unanimous court in *Claiborne Hardware*: "While States have broad power to regulate economic activity, we do not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case. This Court has recognized that expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" (*Id.*, at p. 913 [73 L.Ed.2d at p. 1236], quoting from *Carey* v. *Brown* (1980) 447 U.S. 455, 467 [65 L.Ed.2d 263, 273, 100 S.Ct. 2286].)[8] The court observed that even in the antitrust area, it has been held that the Sherman Act does not proscribe a publicity campaign designed to influence legislation, even if the campaign is undertaken with an anticompetitive purpose. (*Ibid.*, citing *Eastern R. Conf.* v. *Noerr Motors* (1961) 365 U.S. 127 [5 L.Ed.2d 464, 81 S.Ct. 523]; see *State of Mo.* v. *Nat. Organization for Women* (8th Cir. 1980) 620 F.2d 1301, cert. den. (1980) 449 U.S. 842 [66 L.Ed.2d 49, 101 S.Ct. 122] [boycott of states which did not ratify Equal Rights Amendment protected by First Amendment]; but see *Council of Defense* v. *International Magazine Co.* (8th Cir. 1920) 267 F. 390 [boycott of International protesting William Randolph Hearst's alleged pro-German policies held to state an antitrust cause of action; distinguished in *State of Mo.*, *supra*, 620 F.2d at p. 1304, fn. 4].)

Detmold would have us distinguish *Claiborne Hardware* on the basis of the objective sought by the boycott in that case. The activities of those defendants, Detmold suggests, were "clearly entitled to full First Amendment protections as the objective of their boycott was to vindicate rights of equality and freedom that lie at the heart of the Fourteenth Amendment,"

---

[8]Similar expressions of our own abound. We recently observed: "Freedom of speech is 'a right which is at the fountainhead of all our liberties . . . .'" (*Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 319 [193 Cal.Rptr. 900, 667 P.2d 704], citing *Diamond* v. *Bland* (1974) 11 Cal.3d 331, 342 [113 Cal.Rptr. 468, 521 P.2d 460] (dis. opn. of Mosk, J.), cert. den. (1974) 419 U.S. 885 [42 L.Ed.2d 125, 95 S.Ct. 152], overruled by *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910 [153 Cal.Rptr. 854, 592 P.2d 341], affd. (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035].)

whereas these defendants—an "irresponsible few," according to Detmold—are seeking to further merely their private views on environmental matters, and at the expense of Detmold's own rights of free expression.

Detmold's argument might have merit if this were an ordinary case of interference with advantageous economic relationships in the commercial context; for there, as we have observed, courts may be called upon to balance the social and private importance of the defendant's objective against the substantiality of the interest which plaintiff asserts. As in *Claiborne Hardware,* however, defendants' activities constitute a "politically motivated boycott designed to force governmental and economic change" (458 U.S. at p. 914 [73 L.Ed.2d at p. 1237]), and the fact that the change which they seek bears upon environmental quality rather than racial equality, can hardly support a different result. On the contrary, we are precluded by the First Amendment itself from gauging the degree of constitutional protection by the content or subject matter of the speech: "[T]here is an 'equality of status' in the field of ideas" (*Police Department of Chicago* v. *Mosley* (1972) 408 U.S. 92, 95-96 [33 L.Ed.2d, 212, 216-217, 92 S.Ct. 2286]).

Nor is a different result dictated by the fact that the boycott in this case is aimed at changing the editorial policies of a newspaper. The freedom of a newspaper to formulate editorial policies is obviously of great value in our society, and the spectacle of different groups seeking to influence those policies through the use of economic boycott is troublesome to contemplate. Yet, the newspaper is not in a position to claim infringement of its own constitutional rights by such conduct, since no governmental action is implicated, and the degree of economic coercion which exists may be no greater than that which might lawfully be exerted by an advertiser who, on his own, seeks to influence editorial policy by withdrawing or threatening to withdraw its patronage. The market place of ideas contemplated by the First Amendment (*Lamont* v. *Postmaster General* (1965) 381 U.S. 301, 308 [14 L.Ed.2d 398, 403, 85 S.Ct. 1493] [Brennan, J., conc.]) cannot be so insulated. Moreover, this case is not distinguishable from *Claiborne Hardware* on that basis, since in that case, as well, the boycott sought to influence political expression and behavior by private citizens. (*NAACP* v. *Claiborne Hardware Co., supra,* 458 U.S. 886, 911-912 [73 L.Ed.2d 1215, 1234-1235].)

Applying common law principles, and construing them in light of the First Amendment and article I, section 2 of the state Constitution (see *Robins* v.

*Pruneyard Shopping Center, supra,* 23 Cal.3d 899, 908),[9] we conclude that petitioners are entitled to summary judgment as a matter of law.

Let a writ of mandate issue commanding respondent court to vacate its order denying petitioners' motion for summary judgment and directing it to enter a new and different order granting said motion and dismissing this action. Costs to petitioners.

Bird, C. J., Mosk, J., Kaus, J., Broussard, J., and Reynoso, J., concurred.

---

[9]Certain of the distinctions made by the United States Supreme Court in *Claiborne,* between "political" boycotts on the one hand and "economic" or "labor" boycotts on the other, have been criticized by some commentators as artificial (e.g., Harper, *The Consumer's Emerging Right to Boycott: NAACP v. Claiborne Hardware and its Implications for American Labor Law* (1984) 93 Yale L.J. 409, 440-442). For purposes of this opinion it is unnecessary for us to decide, and we do not decide, whether or to what extent such distinctions are appropriate under the California Constitution.