[No. G026329. Fourth Dist., Div. Three. Aug. 21, 2001.]

TONY LAM et al., Plaintiffs and Respondents, v.
KY NGO et al., Defendants and Appellants.

834

### COUNSEL

Lyon Law Office and Geoffrey C. Lyon for Defendants and Appellants.

Callahan & Blaine and Jim P. Mahacek for Plaintiffs and Respondents.

### OPINION

### SILLS, P. J.—

## I. INTRODUCTION

This appeal from the denial of an anti-SLAPP suit motion requires us to come to the following conclusions:

(1) Because the Legislature has specified that the anti-SLAPP suit law (Code Civ. Proc., § 425.16) is to be construed broadly, the provision in the law that a special motion to strike "may be filed within 60 days of the service of the complaint" (§ 425.16, subd. (f)) includes amended as well as original complaints. (See *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 565 [92 Cal.Rptr.2d 755] [considering anti-SLAPP motion to strike first amended complaint]; *Globetrotter Software, Inc. v. Elan Computer Group, Inc.* (N.D.Cal. 1999) 63 F.Supp.2d 1127, 1129 [observing that since the Legislature did not say "original complaint," statutory time period runs "from the filing of the most recent amended complaint"].)[1]

(2) Because the time specified in the anti-SLAPP law (§ 425.16, subd. (f)) allows filing motions to strike within 60 days of the service of amended complaints, and the amended complaint in this case was itself served by mail, the moving party had an extra five days to file his anti-SLAPP suit motion. (§ 1013, subd. (a).) Accordingly, an anti-SLAPP suit motion to strike, filed 64 days after the service of the first amended complaint by mail, was timely.

---

[1]SLAPP stands for "Strategic Lawsuit Against Public Participation," and basically refers to suits directed at some exercise of a person's right of free speech or petition. All statutory references in this opinion are to the Code of Civil Procedure.

(3) Because the issues involved in consideration of a preliminary injunction are different from those involved in an anti-SLAPP suit motion to strike, the granting of a preliminary injunction in favor of the plaintiff does not have collateral estoppel or res judicata effect as against a subsequent anti-SLAPP suit motion. (Compare *Pro-Family Advocates v. Gomez* (1996) 46 Cal.App.4th 1674, 1680-1681 [54 Cal.Rptr.2d 600] [consideration of preliminary injunction entails interrelated factors of likelihood of prevailing *and* the need to prevent interim harm] with § 425.16, subd. (b)(3) [standard for anti-SLAPP suit is whether plaintiff has "established a probability" of prevailing on claim].)

(4) Because the trial judge erroneously assumed both (a) that the anti-SLAPP suit motion was untimely, and (b) that the prior granting of a preliminary injunction precluded consideration of the motion on the merits, the order denying the motion was predicated on two faulty premises. Therefore this court must proceed to the merits of the motion de novo. (See e.g., *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1364 [102 Cal.Rptr.2d 864] ["On appeal, the issues are reviewed de novo."]; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 474 [102 Cal.Rptr.2d 205] ["we review the record de novo"]; *Foothills Townhome Assn. v. Christiansen* (1998) 65 Cal.App.4th 688, 695 [76 Cal.Rptr.2d 516] [reviewing record independently to determine whether trial court correctly denied anti-SLAPP suit motion].)

(5) Because this case involves possible tort liability for the collateral effects of a political protest, three principles set forth in *NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886 [102 S.Ct. 3409, 73 L.Ed.2d 1215] are controlling. They are:

(a) Peaceful picketing of a business for political reasons cannot be burdened by state tort liability, even if it has the effect of interfering with prospective economic advantage. (*NAACP v. Claiborne Hardware Co., supra,* 458 U.S. at p. 918 [102 S.Ct. at p. 3428] [state may not "award compensation for the consequences of nonviolent, protected activity"].)

(b) Violence and other criminal acts *are* bases of tort liability and not constitutionally protected, even when committed out of political motives and in the context of a political demonstration. (*NAACP v. Claiborne Hardware Co., supra,* 458 U.S. at p. 916 [102 S.Ct. at p. 3427] ["No federal rule of law restricts a State from imposing tort liability for business losses that are caused by violence and by threats of violence."].)

(c) An organizer of a political protest cannot be held personally liable for acts committed by other protesters unless he or she authorized, directed or ratified specific tortious activity, incited lawless action, or gave specific instructions to carry out violent acts or threats. (See *NAACP v. Claiborne Hardware Co., supra,* 458 U.S. at p. 927 [102 S.Ct. at p. 3433].)

(6) Applying these principles to the case at hand, we conclude that there is insufficient evidence to implicate the sole named defendant, organizer Ky Ngo, in any of the violent acts that occurred in connection with the protest. We further conclude that the nonviolent aspects of the protest (in which Ngo was implicated) cannot, consistent with *NAACP v. Claiborne Hardware Co.,* support tort liability. Accordingly, the tort causes of action against Ngo must be stricken.

(7) The violent acts associated with the protest do support tort liability, so the case must be remanded to allow the plaintiff to substitute named individuals for any of the Doe defendants who can be shown to have engaged in them.

## II. FACTS

In 1999, a video store in Westminster placed the flag of the North Vietnamese communists and a poster of Ho Chi Minh in the window. Large numbers of Orange County's Vietnamese community were outraged and staged demonstrations at the store.

They also demanded the support of local politicians, including Garden Grove City Council Member Tom Lam. Lam, however—or at least as his court papers in this case would later claim—had been instructed by the Garden Grove City Attorney not to publicly support the anti-video-store demonstrators. He kept mum.

A group of the demonstrators then focused their attention on council member Lam, who, they would later claim, had shown a "conspicuous lack of interest or concern for the Vietnamese community's outrage" at the video store display. (We note the irony in passing: A man who had risked his life to escape from a communist regime was now condemned for being soft on communism.)

Lam owned a restaurant, the Vien Dong, and beginning March 12, 1999, a group of protesters showed up at the restaurant to demand that Lam resign

his city council post. The restaurant's landlord was sympathetic to the protester's position, and allowed them to gather in the parking lot. The Vien Dong's business suffered, and less than a week later, Lam and the restaurant (which is separately incorporated) filed this action against Ky Ngo, the landlord,[2] and 1,500 Doe defendants. A temporary restraining order was issued on March 19, 1999, prohibiting the protesters from "approaching within 20 feet of the entrance and windows" of the restaurant, and from using bullhorns or other amplification equipment that could be heard within the restaurant. By April 2, a modified temporary restraining order established a 50-foot "buffer zone" in all directions from the perimeter around the restaurant's parking lot.

Lam and the restaurant sought a preliminary injunction based on a series of declarations that established these facts: In the period prior to the issuance of the TRO's (temporary restraining orders), protesters (a) physically accosted prospective patrons and shouted epithets at them; (b) in some cases, slashed the tires and pounded on the cars of prospective patrons; (c) used bullhorns to disrupt the meals of those customers who did manage to make it into the restaurant; (d) plastered posters and banners on the side of the restaurant; and (e) even urinated on the side of the restaurant premises. In one instance, an 89-year-old man was surrounded by 30 to 40 protesters who kicked and pounded his car, causing about $250 in damages. When the elderly gentleman finally stepped out of the car, he faced further insults from the crowd. Security guards came to his rescue and escorted him safely away. And when one of the county board of supervisors and his wife tried to have lunch at the restaurant, they were called "motherfuckers" by the crowd as they approached the premises. As they left, protesters stood in front of their car blocking the driveway. Lam also presented evidence that some of the protesters tried to videotape or otherwise record the license plates of some of the restaurant's customers.

Continuing throughout the protests, demonstrators bore numerous signs casting Lam as a communist and a traitor. They carried drawings of Lam as a horned and fanged devil with blood dripping down his mouth. They crafted a life-sized effigy of Lam tied to a gallows next to a life-sized effigy of Ho Chi Minh; a bloody axe bearing a South Vietnamese flag, coffin-like box, and the slogan "Down with the Communists" adorned their creation. The protesters also created three-dimensional effigies of Lam and Ho Chi Minh in lewd sexual positions across the street from the restaurant.

---

[2]The landlord is not a party to this appeal, which involves only Ky Ngo's anti-SLAPP suit motion.

Financially, the restaurant suffered a 40 percent decline in revenues through the end of April, compounded by the extra expense of needing to hire security guards to escort customers through the parking lot. The trial court granted the preliminary injunction May 28, 1999.[3]

On May 24, 1999, four days before the preliminary injunction was granted, Lam filed and served by mail a first amended complaint. His wife was added as a plaintiff, and he alleged these causes of action against Ngo and the protesters: intentional infliction of emotional distress, intentional interference with economic advantage, trespass, and nuisance. Ngo filed a motion to strike pursuant to section 425.16 (i.e., an anti-SLAPP suit motion) on July 28, 1999, 64 days after the service by mail.

The trial court denied the motion in October, and the written order makes it very clear that the denial was based on the fact that Ngo had already lost the preliminary injunction battle and was presenting nothing "new." Indeed, it was on this basis that the court also found that Ngo's motion had been brought to harass the plaintiffs by putting them to extra expense and delay. Accordingly, the court ordered monetary sanctions against Ngo and his trial attorney in the amount of $8,000 as reimbursement for the fees Lam incurred in opposing the motion.

The order also concluded that the motion was untimely under subdivision (f) of section 425.16. That subdivision states: "The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper. The motion shall be noticed for hearing not more than 30 days after service unless the docket conditions of the court require a later hearing." Ngo timely appealed from the order.[4]

---

[3]The injunction required the protesters to stay 900 feet away from the restaurant. Much of Ngo's opening brief is devoted to attacking the 900-foot distance, and intuitively it would appear that his position on the point might have some merit. (See *Planned Parenthood Assn. v. Operation Rescue* (1996) 50 Cal.App.4th 290, 302 [57 Cal.Rptr.2d 736] [250-foot buffer zone around apartment where physician who performed abortions at a local clinic was too restrictive].) However, Ngo never perfected an appeal from the preliminary injunction, so we do not address the merits of the preliminary injunction, except to point out that a different set of legal standards applied.

[4]So solicitous is California law of free speech that orders on SLAPP-suit motions under section 425.16 are immediately appealable. (See § 425.16, subd. (j).) Compare that with *denials* of summary judgment motions, where a litigant may only file a writ petition if he or she wants an immediate review of a possibly erroneous trial court ruling denying the motion. (See § 437c, subd. (*l*).)

## III. Discussion

### A. *Timeliness of Anti-SLAPP Suit Motions*

#### 1. *Original Complaint Only? The Statute Includes Amended Complaints Also*

■ Clearly, the 60-day time period set forth in subdivision (f) of section 425.16 is not jurisdictional. The trial court has the legal authority to allow the filing of an anti-SLAPP suit motion to strike "at any later time [after "60 days of the service of the complaint"] upon terms it deems proper." The nonjurisdictional nature of the time limit is also emphasized by the permissive "may" in the setting forth of the time limit ("The special motion may be filed").

But while the time period is not jurisdictional, the provision specifying that the *court* may allow later filings of the motion still has consequences. There is no *right* to file an anti-SLAPP suit motion beyond the deadline. It can then only be "filed" "in the court's discretion."

The parallel structure of the first operative sentence is also somewhat revealing, in that the verb "may be filed" applies both to what the defendant does as well as what the *court* does. Strictly speaking, of course, merely allowing a later *filing* at the trial court's discretion is somewhat meaningless, because if the trial court were not disposed to hear the motion on the merits, it could (as was the case before us) simply deny the motion as untimely, even though the moving papers had a clerk's file stamp on them. The inference is that the trial court retains the discretion to consider the merits of a special motion to strike filed beyond the 60-day deadline, but also retains the discretion to refuse to hear any such motion on the merits. On the other hand, the statutory language certainly implies that the trial court *must* consider a special anti-SLAPP suit motion on the merits if it is filed within the 60-day deadline.

The first question we must answer, then, is whether the words "the complaint" in section 425.16, subdivision (f) may include amended complaints, or necessarily are restricted to just the original. We conclude that the words include amended complaints.

Primarily, the purpose of the anti-SLAPP suit law would be readily circumventable if a defendant's only opportunity to strike meritless SLAPP claims were in an attack on the original complaint. Causes of action subject to a special motion to strike could be held back from an

original complaint, particularly in situations where, as in the case before us, there are strong equities in favor of granting a preliminary injunction against an anonymous group of protesters, but the imposition of tort liability against a specific individual is problematical.

In context, the "special" anti-SLAPP suit motion is directed at a particular document, namely "the complaint." It would make no sense to read "complaint" to refer to an earlier complaint that contained no anti-free-speech claims, but not allow such a motion for a later complaint that had been amended to contain some. After all, the whole purpose of the statute is to provide a mechanism for the *early* termination of claims that are improperly aimed at the exercise of free speech or the right of petition. (See *Paul for Council v. Hanyecz, supra,* 85 Cal.App.4th at p. 1364 ["the anti-SLAPP legislation found in section 425.16 provides an efficient means of dispatching, early on in a lawsuit, a plaintiff's meritless claims"].)

Secondarily, of course, to the degree there is any ambiguity in the statute that ambiguity should be resolved in favor of a hearing on the merits. A federal district court construing California law first articulated this point in *Globetrotter Software, Inc. v. Elan Computer Group, Inc., supra,* 63 F.Supp.2d at page 1129, pointing to the statutory directive in subdivision (a) of section 425.16 that the statute is to be " 'construed broadly.' " There is no reason to doubt the soundness of the *Globetrotter Software* court's conclusion, which in any event is self-evident.[5]

---

[5]There are no less than three ironies in the fact that Ngo was sanctioned because, as the trial court's order recited, he "cited and relied upon an unpublished federal district court opinion in violation of California Rule of Court 977 and decisional authority."

The first irony is that by October 1999, rule 977 of the California Rules of Court had been amended to *allow* citation or reliance on unpublished opinions, as long as they weren't California state court opinions. So the basis of the court's order sanctioning Ngo was based on out-of-date law.

The second irony is that the *Globetrotter Software* opinion eventually made its way into the Federal Supplement Second, so it wasn't "unpublished" after all, though it had existed only in cyberspace at the time of the hearing on the preliminary injunction.

The third irony is that the "decisional authority" that Ngo supposedly violated began with footnote 34 in the opinion of this court in *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1783 [22 Cal.Rptr.2d 206]. There we observed that a California court need not consider federal and out-of-state opinions that had not been published. The change in rule 977 in 1997 was clearly aimed at that footnote. The irony here is that footnote 34 was written to *relieve* courts and counsel from having to worry about the continuously growing legions of unpublished cases, *not* to add another trap for the unwary practitioner.

We must also reiterate this truth: Unpublished decisions from the federal and out-of-state courts were by definition never *intended* for use as precedent. As Ninth Circuit Court of Appeals Judges Kozinski and Reinhardt have pointed out, unpublished decisions usually do not get the kind of attention that published decisions get. (See Kozinski & Reinhardt, *Please*

Finally, in *DuPont Merck Pharmaceutical Co. v. Superior Court, supra,* 78 Cal.App.4th at page 565, our Supreme Court directed an appellate court to reconsider, in light of *Briggs v. Eden Council for Hope and Opportunity* (1999) 19 Cal.4th 1106 [81 Cal.Rptr.2d 471, 969 P.2d 564], the summary denial of a petition for a writ of mandate seeking to compel the trial court to grant a special motion to strike. The summary denial had been based on the fact that the special motion was untimely because the 60 days began running from the original, as distinct from the amended, complaint. The appellate court took the direction and the reference to *Briggs,* a case dealing with when defamatory statements made in the course of authorized official proceedings are protected, as a signal from the Supreme Court to consider the petition on the merits. The inference from *DuPont* is that our Supreme Court saw nothing wrong in considering an anti-SLAPP suit motion directed against an amended complaint, even though more than 60 days had elapsed since the service of the original complaint.

### 2. *An Extra Five Days If the Relevant Complaint Is Mailed? Yes*

Ngo's motion was filed 64 days after the amended complaint. This fact raises the additional question of whether the moving party on an anti-SLAPP suit motion gets an extra five days for mailing.

The answer is yes, when, as here, the complaint at which the special motion to strike is directed has itself been mailed. Section 1013, subdivision (a) provides in part: "[A]ny right or duty to do any act or make any response within any period or on a date certain after the service of the document, which time period or date is prescribed by statute or rule of court, shall be extended five days, upon service by mail, if the place of address is within the State of California . . . ." The plain terms of the statute would thus add five days for Ngo's "right" to file a special motion to strike to "respond" to the amended complaint.

Certain language in section 1005, subdivision (b) should not be read to the contrary. (The language is: "Section 1013, which extends the time within which a right may be exercised or an act may be done, does not apply to a notice of motion, papers opposing a motion, or reply papers governed by this section.") The key words are "governed by this section." The context of the "section" is the series of minimum specifications for the time period between the filing of a motion and the time it is heard. (The first sentence starts

---

*Don't Cite This! Why We Don't Allow Citation to Unpublished Dispositions* (June 2000) Cal. Law. 43-44 [contrasting care that must go into opinions intended for use as precedent with work on unpublished "memdispos"].) Thus, even though a litigant can certainly cite and rely on such decisions in state court under the amended rule, California courts are well within their own power to view such "precedent" as having little or no weight in and of itself.

the theme: "Unless otherwise ordered or specifically provided by law, all moving and supporting papers shall be served and filed at least 21 calendar days before the hearing.") The focus of section 1005 is minimum notice of one's papers before any hearing. The reference to section 1013 in section 1005 is to prevent section 1013 from reducing the period of minimum notice. It has no application in a context where the deadline to bring a motion is the service by mail of a complaint or amended complaint.

### B. *Does a Preliminary Injunction Have an Issue Preclusive Effect on an Anti-SLAPP Motion? No*

The trial court did not consider the merits of Ngo's motion because it viewed the motion as nothing more than a rerun of the preliminary injunction question. But the standards bearing on the two kinds of proceedings are different, so the special motion to strike should have been evaluated on its own merits. Collateral estoppel requires, among other things, that the *issue* be the same.

In deciding whether to grant preliminary injunction, the trial court not only assesses "the likelihood that the plaintiff will prevail at trial," but "the interim harm that the plaintiff will likely sustain if the injunction were denied." (*Pro-Family Advocates v. Gomez, supra,* 46 Cal.App.4th at pp. 1680-1681.) Trial courts must balance the respective equities, and in any event the decision is tested under an abuse of discretion standard. (*Id.* at p. 1680.)

By contrast, in passing on anti-SLAPP suit motions, the trial court faces a much more binary task, more akin to a summary judgment motion: Has the plaintiff made a prima facie showing of facts which, if proved at trial, support a favorable judgment? (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823 [33 Cal.Rptr.2d 446].)

The present case illustrates how the plaintiff's ability to obtain a preliminary injunction cannot be equated with a "probability" the plaintiff will prevail on the claim (the statutory standard for anti-SLAPP suit motions; see § 425.16, subd. (b)). Here, strong equities certainly favored the grant of a preliminary injunction requiring the protesters to be at least some distance from the Vien Dong restaurant. Those equities included at least the dramatic drop in the restaurant's business and the willingness of the protesters to copy down the license plates of the restaurant's customers.

But by the same token it cannot be assumed that any of the tort causes of action directed against Ngo personally would withstand substantive scrutiny

under section 425.16. (A topic we explore in detail in the next section of this opinion.) An individual organizer of a political protest is not necessarily liable for acts of " 'animal exuberance' " perpetrated by the protesters. (*NAACP v. Claiborne Hardware Co., supra,* 458 U.S. at p. 924 [102 S.Ct. at pp. 3431-3422], quoting *Drivers Union v. Meadowmoor Co.* (1941) 312 U.S. 287, 293 [61 S.Ct. 552, 555, 85 L.Ed. 836, 132 A.L.R. 1200].) In *Claiborne Hardware,* for example, the United States Supreme Court held that Charles Evers and the NAACP could not be held liable in tort for business losses incurred during a boycott of White merchants in Claiborne County, Mississippi, even though some of those losses could undoubtedly be attributed to a number of acts of violence directed at Black individuals who did not participate in the boycott.[6] The federal high court held that there was simply insufficient evidence of their *authorization* of the wrongful conduct.

Additionally, a key difference between preliminary injunctions and special motions to strike is the role of the individual cause of action. A single cause of action can sustain a preliminary injunction. (See *California Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542, 552 [94 Cal.Rptr.2d 194].) By contrast, an anti-SLAPP suit motion involves examination of each of the causes of action attacked, because the purpose is to weed out meritless "claims" at an early stage. (See *Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 823.) In the context of this case, for example, the single cause of action against the protesters as a group for nuisance might indeed be meritorious. But the meritoriousness of that cause of action couldn't make valid a cause of action brought by a public figure for intentional infliction of emotional distress claim based on, say, being called a "communist."

In sum, the fact that a preliminary injunction was granted did not prevent consideration of the merits of the anti-SLAPP suit motion.

---

[6]The incidents of violence were not unlike those involved in the present case, except obviously more extensive, as they covered a seven-year time period beginning in the 1960's. The *NAACP v. Claiborne Hardware Co.* court noted these specific incidents: Shots were fired at a house in two cases. Someone threw a brick through a windshield. Tires were slashed. Someone damaged a flower garden. One NAACP member took away a man's whisky bottle bought from a White merchant. Four men grabbed and beat up a fisherman who failed to observe the boycott. (458 U.S. at pp. 904-906 [102 S.Ct. at pp. 3420-3422].) And there was an incident in which a "group of young blacks apparently pulled down the overalls of an elderly brick mason known as 'Preacher White' and spanked him for not observing the boycott." (*Id.* at p. 905 [102 S.Ct. at p. 3421].)

## C. *The Merits*

### 1. *No Connection of Ky Ngo to Any of the Wrongful or Violent Activity Done by Some of the Protesters*

■ As mentioned above, denials of anti-SLAPP suit motions are reviewed de novo by appellate courts. (*Paul for Council v. Hanyecz, supra,* 85 Cal.App.4th 1356, 1364; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 474 [102 Cal.Rptr.2d 205]; *Foothills Townhome Assn. v. Christiansen, supra,* 65 Cal.App.4th at p. 695.) In reviewing the record de novo, the fact that Lam opposed Ngo's motion based solely on the evidence supporting the preliminary injunction, and did not go out and try to link Ngo to any specific violent act, now takes special importance.

■ The basic two-prong framework for analyzing an anti-SLAPP suit motion is well established. First prong: Has the defendant shown that the causes of action he or she is attacking arise from acts in furtherance of the right of free speech or petition? (See *DuPont Merck Pharmaceutical Co. v. Superior Court, supra,* 78 Cal.App.4th at p. 567, citing § 425.16, subd. (b)(1).) Here, there is no doubt that the protests directed at a public figure (Lam) based on his stand concerning an issue of public significance in his constituency (whether a local video store should be displaying the flag of the North Vietnamese communists) satisfies the first prong, and Lam makes no argument to the contrary.

The second prong focuses on the "probability" that the plaintiff will prevail on the claim (*DuPont Merck Pharmaceutical Co. v. Superior Court, supra,* 78 Cal.App.4th at p. 567), which case law has refined into an inquiry as to whether the *plaintiff* has made a "prima facie showing of facts" that, if proved at trial, would support a judgment in the plaintiff's favor. (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 823.) Thus an important substantive aspect of the law is that, once it has been shown a cause of action is based on the defendant's exercise of free speech or petition, it is the plaintiff who has the burden of making a prima facie case of prevailing.

In regard to Ky Ngo personally, however, we cannot say that the burden has at all been met. ■ *NAACP v. Claiborne Hardware Co.* is quite clear that there must be some evidence of authorization, direction, or ratification of "specific" constitutionally unprotected tortious activity by the organizer of a protest before the organizer can be held responsible for the consequences of the activity. (*NAACP v. Claiborne Hardware Co., supra,* 458 U.S. at p. 927 [102 S.Ct. at p. 3433].)

Lam may have had a good case against the protesters generally for a preliminary injunction based on nuisance, but the evidence against Ngo

personally is very thin indeed. A Garden Grove Police Department lieutenant declared that on the first day of the protest, March 12, 1999, "A gentleman approached me and identified himself as Ky Ngo and said he was an organizer of the protest, which again, is directed at Mr. Lam. Mr. Ngo assured me that he wanted a peaceful demonstration and that the protesters would limit their activities to the public sidewalk in front" of the restaurant. Lam produced several declarations to the effect that on April 4, Ngo had "instructed" the protesters not to take a copy of the TRO when one of Lam's daughters attempted to serve them with it. (Ngo controverted this allegation with his own set of declarations denying he had ever said any such thing, and in fact claimed to have posted the TRO himself on a fence for his fellow protesters to see.) Those declarations also asserted that just before Ngo made the "don't take it" statement, Ngo went 20 feet inside the then 50-foot buffer zone and screamed at one of Lam's process servers "you cannot stop them, they are just citizen [sic] with flags." On April 5, Ngo apparently also violated the buffer zone, was confronted by Lam's daughter, walked back, made some rude gestures toward Ms. Lam, took some pictures of her, and then "screamed in Vietnamese the equivalent of, 'I will send these pictures to Playboy magazine.'"

And that, unless we have missed some reference to Ngo in this record or otherwise blinked, is pretty much it so far as the evidence of Ngo's personal involvement in the protests. None of the declarations delineating the clearly wrongful acts involved in the early days of the protests—such as the slashed tires, the posting of banners on the restaurant, the urination on it, or even the direct intimidation of any of the customers in the parking lot—show that such acts were authorized, directed or ratified by Ngo.[7]

There was, in fact, far more in *NAACP v. Claiborne Hardware Co.,* to link Charles Evers, the field secretary of the state NAACP, to the sporadic acts of violence in that case. Evers organized the boycott, made "emotional and persuasive appeals for unity in the joint effort," and even made " 'threats' of vilification and social ostracism." (*NAACP v. Claiborne Hardware Co., supra,* 458 U.S. at p. 926 [102 S.Ct. at pp. 3432-3433].) Even so, Evers's conduct was "constitutionally protected and beyond the reach of a damages award." (*Ibid.*) In the case before us, as in *NAACP v. Claiborne Hardware Co.,* tort liability cannot be predicated merely on Ngo's role as an "organizer" of protests in which some protesters committed wrongful acts. Ngo

---

[7]In the respondent's brief Lam is forced to implicate Ngo personally either by the use of generalities ("The Lams submitted evidence that Ngo engaged in illegal conduct [the allusion to the violation of the TRO], in Ms. Lam's presence. The Lams submitted declarations that Ngo's conduct caused emotional distress to Tony Lam and his family.") or by imputing to Ngo the acts of his "cohorts" ("Tony Lam submitted evidence that Ngo's cohorts" [and then follows a list of the violent acts we have mentioned]).

didn't even make a "persuasive speech." The record lacks any "threat" of vilification or social ostracism.

The worst that can be said about his actual conduct is that he violated the extended 50-foot buffer zone a few times, "instructed" his fellow protesters not to take copies of the TRO, and taunted Lam's daughter. While Ngo's violation of the restraining order on those occasions may indeed have subjected him to contempt of court (perhaps the same may be said of his "instruction" not to take the TRO), any effect on Lam or the Vien Dong restaurant from those nonviolent incursions was de minimis in terms of the tort causes of action alleged against him in the first amended complaint.

### 2. *No Tort Liability Against Ky Ngo or Any Other Protester for the Peaceful Speech Connected to the Protest*

#### a. *Intentional Interference with Prospective Economic Advantage*

■ The next question is whether the fact of the protests, or the statements made in connection with them, can support tort liability—in particular based on causes of action for interference with prospective economic advantage or intentional infliction of emotional distress. In this regard it must be remembered that there is no dispute that Tony Lam, as a local politician, is a public figure.[8]

We must begin by distinguishing labor law disputes from public protests which are political in nature. There is a well-established line of federal Supreme Court cases centered on *Carpenter's Union v. Ritter's Cafe* (1942) 315 U.S. 722 [62 S.Ct. 807, 86 L.Ed. 1143], which establish that at least the picketing of noncombatants in a labor dispute can be prohibited by state law. In *Ritter's Cafe*, union members picketed a cafe that was owned by a man who was employing nonunion labor on a construction site a mile and a half away. The United States Supreme Court held that state law could constitutionally ban picketing at the cafe, because the picketing there amounted to the "conscription of neutrals" in a dispute that otherwise did not affect them. (See *id.* at p. 728 [62 S.Ct. at p. 810].) Then again, substantive California law would appear to be more solicitous of free speech when the "neutral" being picketed in a labor dispute is the business of a public official. (See

---

[8]On the other hand, neither Lam's wife nor his restaurant is a public figure, and they are plaintiffs as well. However, the "speech" part of this case, i.e., the picketing *qua* picketing and the effigies, were all directed at Lam, not his restaurant. While, in the early days of the protest, a number of anonymous protesters yelled "how does it feel to eat shit," or words to that effect, at customers emerging from the restaurant, this is not a case for trade libel. Our opinion, however, should not be read to preclude claims based by the restaurant on such remarks against the protesters, presently unknown according to this record, who uttered them.

*Pittsburg Unified School Dist. v. California School Employees Assn.* (1985) 166 Cal.App.3d 875, 893-894 [213 Cal.Rptr. 34] [teachers union members had constitutional right to pass out leaflets on the public sidewalk in front of the businesses of school board members].)

The labor cases are, in any event, of only limited use in the case before us. *NAACP v. Claiborne Hardware Co.* specifically confronted the labor union cases, but said they were explained by the "broad power" of the states "to regulate economic activity," a right which was *not* comparable to the "right to prohibit peaceful political activity" such as the boycott in that case against the White merchants. (*NAACP v. Claiborne Hardware Co., supra,* 458 U.S. at pp. 912-913 [102 S.Ct. at pp. 3425-3426].) Our conclusion in this regard is reinforced by our own high court's decision in *Environmental Planning & Information Council v. Superior Court* (1984) 36 Cal.3d 188 [203 Cal.Rptr. 127, 680 P.2d 1086], which involved an organized effort by an environmental group who published a newsletter to boycott the advertisers of a newspaper that was perceived by the group as too pro-developer. The *Environmental Planning & Information Council* court specifically referenced the *Claiborne Hardware* distinction between "solely economic boycott activity" and "peaceful political activity," and concluded that the trial court should have granted a summary judgment on a complaint predicated on a cause of action for intentional inference with prospective economic advantage. (See *Environmental Planning & Information Council, supra,* 36 Cal.3d at pp. 193, 196, 198.)

For our purposes there is no basis on which to distinguish the White merchants who were boycotted by Black customers in *NAACP v. Claiborne Hardware Co.* and the Vien Dong restaurant here. Indeed, the connection between the political purpose of the picketing here and the target is, if anything, closer than in *NAACP v. Claiborne Hardware Co.*, where the only reason for boycotting was the color of the owner's skin. Here, at least, the restaurant is owned by a political figure. If liability for interference with prospective economic advantage could not constitutionally be imposed in *NAACP v. Claiborne Hardware Co.* (or *Environmental Planning & Information Council* for that matter) it cannot constitutionally be imposed here.

b. *Intentional Infliction of Emotional Distress*

Almost all the cases involving public figures suing for intentional infliction of emotional distress involve publications, and are thus typically governed by the principles set forth in *Hustler Magazine v. Falwell* (1988) 485 U.S. 46 [108 S.Ct. 876, 99 L.Ed.2d 41]. The rule is: A public figure "may not recover for the tort of intentional infliction of emotional distress

. . . without showing . . . that the publication contains a false statement of fact . . . ." (*Id.* at p. 56 [108 S.Ct. at p. 882].)

While the *Hustler* case involved a magazine parody, there can be no doubt that its basic framework must apply to picket signs and effigies as well. In the context of peaceful picketing in a place where the picketer has a right to be, there is no meaningful difference in terms of the medium between words on a picket sign and, as in *Falwell*, a fake ad in a magazine. The same may be said for effigies, which are surely at least as protected a form of political communication as flag burning. (See *United States v. Eichman* (1990) 496 U.S. 310 [110 S.Ct. 2404, 110 L.Ed.2d 287]; *Texas v. Johnson* (1989) 491 U.S. 397 [109 S.Ct. 2533, 105 L.Ed.2d 342].)

The federal high court's subsequent opinion in *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1 [110 S.Ct. 2695, 111 L.Ed.2d 1], has refined the *Falwell* court's requirement of "false statement of fact," at least in the defamation context. While there is not "an additional separate constitutional privilege for 'opinion' " (*Milkovich, supra,* 497 U.S. at p. 21 [110 S.Ct. at p. 2707]), statements "that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" are still constitutionally protected. (*Id.* at p. 20 [110 S.Ct. at p. 2706].) Thus the *Milkovich* court made clear that " 'rhetorical hyperbole' " (*ibid.*) or "loose, figurative, or hyperbolic language" which would "negate the impression that the writer was seriously maintaining" a proposition that was "sufficiently factual to be susceptible of being proved true or false" is protected. (*Id.* at p. 21 [110 S.Ct. at p. 2707].)

The content of the signs and effigies in this case was that Lam was a communist sympathizer, and—as rather grossly expressed in the effigies— the ideological lackey of Ho Chi Minh. That these sentiments would appear to be grossly unfair to Lam—himself an immigrant who risked his life to escape from a Communist country—is beside the point. The dispositive question is whether they constituted protected rhetorical hyperbole or loose language.

On that point the answer must be yes. In context, the protesters were making a political point as to what they thought of Lam's stand on the video store controversy.

Charges of communism are part of the heat of the political kitchen.[9] (See *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 273, fn. 14 [84 S.Ct.

---

[9]So are charges of fascism. (See *Buckley v. Littell* (2d Cir. 1976) 539 F.2d 882, 890-895 [charge that political commentator William F. Buckley, Jr., was "fellow traveler of fascism" not actionable].)

710, 722, 11 L.Ed.2d 686, 95 A.L.R.2d 1412] [observing that political figures often must face charges of "communist sympathies"]; *Milkovitch v. Lorain Journal Co., supra,* 497 U.S. at p. 20 [110 S.Ct. at p. 2706] [hypothetically observing that the statement, " 'In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin' " would not be actionable]; *Nat. Ass'n, etc. v. Central Broadcasting* (1979) 379 Mass. 220 [396 N.E.2d 996, 1002] [charge of communism against union on talk show was "most likely taken by the audience as mere pejorative rhetoric"]; see also *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 280 [105 Cal.Rptr.2d 674] [use of words "thief" and "liar" in heated oral exchange at shopping center in the midst of "hard-fought initiative contest" held protected as loose, figurative or hyperbolic language]; *Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 951 [52 Cal.Rptr.2d 357] [political mailer charging state official with having "ripped off" taxpayers because he had an outside job was, in context, protected as "rhetorical hyperbole that is common in political debate"].)[10] As Justice Kline wrote in the *Pittsburg Unified School Dist.* case, "Public office is no place for the thin-skinned." (*Pittsburg Unified School Dist. v. California School Employees Assn., supra,* 166 Cal.App.3d at p. 899.)

The protesters were not accusing Lam, like Chambers vis-à-vis Hiss, of being an actual member of a secret Communist cell. (See *Nat. Ass'n, etc. v. Central Broadcasting, supra,* 396 N.E.2d at p. 1002 [there is a difference between charging a person with " 'communism' " and "charging him specifically with being 'a member of the Communist Party' "].) In context, their statements were not susceptible to verification using a falsifiability test.[11]

It is true, as Lam's brief reminds us, that the word "Communist" has some real sting in the Vietnamese community in Orange County, California. That

---

[10]Nothing in *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789] is to the contrary, though in that case one of the defamatory statements made in the magazine of the John Birch Society was that the plaintiff was a "Leninist" and a " 'Communist-fronter.' " (*id.* at p. 326 [94 S.Ct. at p. 3000].) Those statements were among a set of four which formed the basis for the defamation action, and the other three (the plaintiff had a criminal record, the plaintiff was a member of the National Lawyers Guild which had organized the attack on Chicago police during the 1968 Democratic convention, and the plaintiff was a member of the Marxist League for Industrial Democracy) were all clearly statements of fact, subject to verification on a falsifiability test. (The court merely observed that there was "no basis" for these charges. (*Ibid.*)) The *Gertz* court never considered whether the "Leninist" and "Communist-fronter" statements were not susceptible to verification, because the case reached the high court on the issue of whether the *New York Times* standard for a public figure applied in cases where *private* figures were involved in public controversies.

[11]The falsifiability test underlies the *Milkovich* case, with its emphasis on whether there has been a "false assertion of fact." (See *Milkovich v. Lorain Journal Co., supra,* 497 U.S. at p. 19 [102 S.Ct. at p. 2706].) The test provides the breathing space for polemicists to go inveighing while still not protecting actual false statements of fact just because they are preceeded by the words, "in my opinion" or "I think." (See *ibid.*) An excellent example of the distinction may

community, after all, consists of many people who have actually lived under a Communist regime. Then again, such folks are in a better position to appreciate First Amendment freedoms than some of us who have not lived in a totalitarian country.

### 3. The Conduct of the Doe Defendants Who Participated in the Violence Is Not Protected

■ As in *NAACP v. Claiborne Hardware Co.*, the present case involves discrete "elements of criminality," and certainly tortious conduct unprotected by the First Amendment. (See *NAACP v. Claiborne Hardware Co., supra*, 458 U.S. at p. 888 [102 S.Ct. at p. 3413].) Justice Stevens there noted, the "First Amendment does not protect violence" (*id.* at p. 916 [102 S.Ct. at p. 3427]) and the present case—particularly events in the first week of the protests—certainly involved acts of violence, not political theater. Some protesters, presently anonymous, accosted patrons of the Vien Dong, slashed the tires of cars, plastered posters on the outside of the restaurant, and urinated on it. All clearly unprotected acts. Our conclusion that the record contains no support for a prima facie case that Ky Ngo, as an individual, authorized, directed or ratified these acts does not mean that *someone* isn't liable for them.[12] On remand, Lam should have the opportunity to substitute for existing Does any individuals who participated in the violent acts involved in this case, or any as yet unnamed organizer who can be shown to have authorized, directed or ratified those acts.

---

be found in *Buckley v. Littell, supra*, 539 F.2d 882. A statement in a book that the plaintiff was a fellow traveler of fascism was not actionable because those terms were loaded with "tremendous imprecision." (See *id.* at p. 893.) But the same book also said that "Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel" indicating that he had "implicitly libeled several people." (*Id.* at p. 895.) That, said the Second Circuit Court of Appeals, was "an assertion of fact" as distinct from "loosely definable, variously interpretable statements of opinion" (*ibid.*) and could even justify a punitive damage award, albeit a small one under the facts of that case. (See *id.* at p. 897.)

[12]Because this case comes to us in an appeal from an anti-SLAPP suit motion, we confine our determination regarding the viability of Lam's causes of action against the Does to the question of whether the Does enjoyed First Amendment protection for their acts. (Answer, with regard to the violent acts: no.) We do not address the substantive merits of each cause of action apart from the question of First Amendment protection. An anti-SLAPP suit motion is not a substitute for a demurrer or summary judgment motion.

## IV. CONCLUSION

We reverse the order denying the anti-SLAPP suit motion as it applies to Ky Ngo.[13] However, Tony Lam and the other plaintiffs have shown that other, anonymous, protesters did engage in violent acts for which there is no First Amendment protection. We therefore affirm the order to the extent it contemplates causes of actions against any Doe defendants based on violent acts. On remand Lam and the other plaintiffs should be given ample opportunity to substitute for current Doe defendants any specific individuals who were actually involved in the wrongful acts which we have identified in this opinion.

In the interests of justice, both sides will bear their costs on appeal.

Rylaarsdam, J., and O'Leary, J., concurred.

---

[13]The good news for Lam and the other plaintiffs is that Ky Ngo's opening brief did not address the sanction order in the slightest, and he has filed no reply brief, so any argument that the sanction order was in error has been waived. The sanction order is therefore not affected by our decision today. While such a result is anomalous, it would be unfair to Lam under these circumstances to conclude anything else.

The bad news for the plaintiffs is that their motion to have Ky Ngo and his counsel sanctioned for a frivolous appeal obviously, in light of our disposition, has no merit and is hereby denied.